UNITED STATES of America, Appellant,

v.

Arthur LIEBERMAN.

No. 91–5687.

United States Court of Appeals,
Third Circuit.

Argued Jan. 30, 1992.

Decided July 24, 1992.

Michael Chertoff, U.S. Atty., Alain Leibman, Asst. U.S. Atty., Edna B. Axelrod (argued), Newark, N.J., for appellant.

Kim D. Ringler (argued), Hackensack, N.J., for appellee.

Before: SLOVITER, Chief Judge, MANSMANN, and HUTCHINSON, Circuit Judges.

### OPINION OF THE COURT

SLOVITER, Chief Judge.

Appellee Arthur Lieberman pled guilty to one count of bank embezzlement and one count of attempted income tax evasion. The judgment of sentence imposed five years of probation on each count to be served concurrently, eight months of home detention, restitution of $128,442.37 plus interest, and a special assessment of $100. The court also ordered Lieberman to pay

10% of his gross weekly salary towards restitution to the bank and to file an amended tax return for the years affected by his embezzlement.

The government appeals, arguing that the district court erred in its application of the United States Sentencing Guidelines (U.S.S.G. or Guidelines) (1) in concluding that the two-level increase for "abuse of position of trust" under U.S.S.G. § 3B1.3 was inapplicable; (2) in providing an additional level of downward adjustment for what the court termed Lieberman's extraordinary degree of acceptance of responsibility; and (3) by departing downward for an "inappropriate manipulation of the indictment."

## I.

### Facts and Procedural History

The facts are largely uncontested.[1] Lieberman began working at the National Community Bank in Maywood, New Jersey in 1980 as a management trainee. He was promoted several times and became a vice president of the bank. One of Lieberman's duties was to balance the bank's suspense account, the account in which loan and fee payments received by the bank were placed pending transfer to other accounts. Lieberman admitted that he "proved the ending balance [of the suspense account] at the end of the month" and that no one else was watching the account.

Between late 1985 and January 1990, Lieberman engaged in approximately 36 separate transactions in which he transferred money from the bank's suspense account into his own checking account in amounts ranging from $1,000 to $7,500. During this period, Lieberman did not report the embezzled money on his tax returns.

In early 1990, Lieberman was confronted by bank officials concerning the improper transactions and immediately admitted his wrongdoing. He explained to managers of the bank how he was able to avoid detection of the transfers and resigned from his position as vice president on January 30, 1990. He went to the FBI to admit his embezzlement from the bank.

On January 17, 1991, Lieberman signed a plea agreement. Pursuant to this agreement, on May 2, 1991, Lieberman entered a plea of guilty to a two-count information charging him with bank embezzlement, in violation of 18 U.S.C. § 656 and 18 U.S.C. § 2, and attempted income tax evasion, in violation of 26 U.S.C. § 7201.

Although Lieberman pled guilty to a charge that he embezzled approximately $94,000, and the plea agreement stipulated that the loss to the bank was between $50,001 and $100,000, Lieberman entered into a consent judgment with the bank (which was duly executed by the Superior Court for Bergen County, New Jersey on May 24, 1991) whereby he agreed to pay the bank $128,442.37 along with pre-judgment interest in the amount of $11,967.04.

The presentence report prepared by the United States Probation Office under the Sentencing Guidelines determined that Lieberman's total offense level was thirteen. The Probation Office arrived at this figure by grouping the tax evasion and embezzlement counts under U.S.S.G. § 3D1.2;[2] calculating the base offense level for bank embezzlement at four, U.S.S.G. § 2B1.1; increasing by seven levels because the amount of loss was approximately $94,000, U.S.S.G. § 2B1.1(b)(1);[3] increasing by two

---

1. The facts are taken from the presentence report prepared by the United States Probation Office, the FBI report containing Lieberman's admissions to the authorities, and the transcript of Lieberman's sentencing hearing.

2. Unless otherwise indicated, all references to the Sentencing Guidelines in this opinion will be to those in effect on the date Lieberman was sentenced, July 15, 1991, as these are the Guidelines that must be applied. *See* 18 U.S.C. § 3553(a)(4)–(5) (1988).

3. Because the government has not challenged the 7-level increase in either the district court or this court, we do not consider whether under the Guideline in effect when Lieberman was sentenced on July 15, 1991, the increase should have been by 8 levels, rather than 7, based on the amount of the loss to the bank. *See* U.S.S.G. § 2B1.1(b)(1)(I) (providing for 8-level increase in offense level where amount of loss exceeds $70,000 but is not greater than $120,000). We note that the Guideline in effect until November 1, 1989 provided for a 7-level increase when the

levels for more than minimal planning, U.S.S.G. § 2B1.1(b)(5); increasing by two levels for abuse of a position of trust, U.S.S.G. § 3B1.3; and decreasing by two levels for acceptance of responsibility, U.S.S.G. § 3E1.1(a).

Both the government and Lieberman objected to some elements of this calculation. The government objected to the grouping of the embezzlement and tax evasion counts. Lieberman objected to the two-level increase based on abuse of trust, and also contended that there were unusual circumstances regarding his acceptance of responsibility warranting a downward departure.

At the sentencing hearing on July 15, 1991, the district court sentenced Lieberman based on a total offense level of ten. The court deviated from the presentence report in three respects: (1) it ruled that the two-level increase for abuse of a position of trust provided in section 3B1.3 of the Guidelines was inapplicable; (2) it departed downward one level based on Lieberman's unusual degree of acceptance of responsibility; and (3) it ruled that the embezzlement charge and the tax evasion charge should not be grouped under U.S.S.G. § 3D1.2, which had the effect of increasing Lieberman's total offense level by two levels, but then it departed downward by two levels because of what it termed an "inappropriate manipulation of the indictment." The court accepted the other aspects of the Guidelines calculation contained in the presentence report.

We have jurisdiction over the government's appeal of Lieberman's sentence under 18 U.S.C. § 3742(b) (1988) and 28 U.S.C. § 1291 (1988).

## II.

### Discussion

### A.

### Abuse of Position of Trust

■ The government's contention that the district court erred in not increasing

amount of loss was between $50,001 and $100,000. See U.S.S.G. appendix c, at 39 para. 99

Lieberman's sentence by two levels for abuse of a position of trust implicates section 3B1.3 of the Sentencing Guidelines. This section provides, in relevant part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

U.S.S.G. § 3B1.3.

The district court concluded that section 3B1.3 was inapplicable because the "basic offense here is bank embezzlement, which by definition implies that one must be a bank employee or otherwise rightfully come into possession of the money which one takes wrongfully." App. at 41. The district court added that "[u]nder the facts of this case I cannot say that a special skill or abuse of position of trust was involved here, but rather by analogy, even though Mr. Lieberman was one of forty vice presidents in the bank, his actions in dealing with this particular account can best be analogized to that of an ordinary bank teller." Id.

We have previously held that the two-level increase for abuse of position of trust may be applied to the crime of bank embezzlement because abuse of position of trust is not "included in the base offense level or specific offense characteristic" applicable to bank embezzlement. See United States v. Georgiadis, 933 F.2d 1219, 1225 (3d Cir. 1991) (reasoning that while embezzlement always involves breach of duty of trust, it does not always involve abuse of position of trust); accord United States v. McElroy, 910 F.2d 1016, 1027–28 (2d Cir.1990). Thus, section 3B1.3 should have been applied if Lieberman occupied a position of trust and if he "abused his position in a way that substantially facilitated the commission or concealment of the crime."

(1991).

*United States v. McMillen,* 917 F.2d 773, 775 (3d Cir.1990).

Although the district court did not expressly address whether Lieberman was in a position of trust when the embezzlement occurred, we have previously stated that this inquiry "approaches a purely legal determination," so "a standard approaching *de novo* review is appropriate." *Id.*

■ As the Ninth Circuit has observed, "the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Hill,* 915 F.2d 502, 506 (9th Cir.1990). The *Hill* court stated that a defendant does not ordinarily occupy a position of trust if any attempt by the defendant to abuse his position would be readily detected by the other party, but "if one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first." *Id.*

We have recently had occasion to consider the abuse of position of trust Guideline in a related context. In *McMillen,* 917 F.2d 773, the district court analogized a savings and loan branch manager who misapplied funds to a bank teller and held that the two-level increase for abuse of position of trust was inapplicable. We reversed, explaining that the defendant's authority to approve loan applications, issue savings certificates, and sign bank documents without supervisory approval required the conclusion that the defendant served in a position of trust. *Id.* at 775.

In this case, Lieberman has not disputed the statement in the presentence report that he alone was responsible for balancing the suspense account and that nobody else was watching the account. Unlike the bank teller whose accounts must be balanced at the conclusion of each day and who is under frequent surveillance, Lieberman was able to conduct approximately 36 transactions over more than four years before being caught. This fact alone belies any suggestion that the bank was regularly watching over Lieberman's handling of the suspense account.

It follows that Lieberman was placed in a position to commit a "difficult-to-detect wrong." *See Hill,* 915 F.2d at 506. Thus, he occupied a position of trust at the bank within the meaning of U.S.S.G. § 3B1.3.

■ Lieberman's occupation of a position of trust at the bank is a necessary, but not a sufficient, condition to warrant the application of the two-level increase for abuse of position of trust. Lieberman must also have abused his position of trust "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. As the commentary to section 3B1.3 explains, "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." U.S.S.G. § 3B1.3, Application Note 1.

Lieberman stresses that he was only one of 40 vice presidents of the bank, that he merely transferred the funds from one account to another, and that the detection of missing funds occurred in a routine examination. We believe, to the contrary, that the apparent ease with which Lieberman was able to effect the crime over a four-year period shows the nexus between the position of trust which he held and the commission and concealment of the embezzlement. *Cf. McMillen,* 917 F.2d at 776 (since defendant, in his capacity as branch manager, approved the loans to himself and issued the savings certificates and documents relating to the transactions, "[t]he record simply [did] not support the district court's finding that 'an ordinary bank teller' could have 'embarked upon a reasonably similar scheme of embezzling the funds and covering it up so it would not have been detected' ").

We find instructive the Fifth Circuit's decision in *United States v. Ehrlich,* 902 F.2d 327 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 851 (1991). In *Ehrlich,* a bank loan clerk who was responsible for "loan balancing" was required to verify the processing of loan

transactions and had the authority to transfer funds among accounts by filling out debit and credit slips. The clerk committed embezzlement by filling out slips transferring money from the bank's accounts to her own checking account. The Fifth Circuit upheld the sentencing court's application of the abuse of position of trust Guideline to the clerk, rejecting the clerk's argument "that she [was] like an ordinary teller, and that her position merely afforded her an opportunity to embezzle 'that could as easily have been afforded to other persons.'" The court explained:

> Perhaps any number of [bank] employees could have obtained and executed the same instruments, debit and credit slips, and then routed them to [the computer system] for processing, but Ehrlich's position of trust gave her ... the authority to routinely initiate loan balancing transactions, which facilitated her embezzlements. Ehrlich was given the authority to balance the loan suspense account, which she debited to effect three of the six embezzlements.

*Id.* at 331.

We also find persuasive *Hill*, 915 F.2d 502, in which the Ninth Circuit upheld the application of the two-level increase for abuse of a position of trust to a truck driver who, charged with the responsibility of transporting a family's belongings to Texas, sold some of the items along the way. Responding to defendant's argument that the abuse of trust Guideline was inapplicable because his position " 'provided an opportunity that could have been afforded to any other truck driver,' " the court explained that the relevant inquiry was not whether other truck drivers could have committed the offense, but rather whether the defendant, "relative to all people in a position to conspire to steal goods from interstate commerce (*i.e.*, the public at large), was in a superior position as a result of a trust relationship." *Id.* at 507–08.

▮ Similarly, here, the salient inquiry is not whether the other forty to fifty vice presidents could also have committed the offense, but rather whether Lieberman took advantage of his superior position of

trust to commit the embezzlement relative to other persons who could commit bank embezzlement (*i.e.*, other bank employees). Given that Lieberman was the only person responsible for balancing the suspense account and that he accomplished the embezzlement by transferring money from this account over an extended period of time, it is clear that Lieberman's position of trust contributed in a substantial way toward both the commission and the concealment of the offense. We find that the district court's holding that U.S.S.G. § 3B1.3 is not applicable to Lieberman cannot be upheld, and we will remand with directions to add the appropriate two-level increase. *See* 18 U.S.C. § 3742(f)(1) (1988); *Williams v. United States,* —— U.S. ——, ——–——, 112 S.Ct. 1112, 1118–19, 117 L.Ed.2d 341 (1992).

### B.

### *Downward Departure for Degree of Acceptance of Responsibility*

We consider next the government's argument that the district court erred in providing an additional level of downward adjustment based on Lieberman's degree of acceptance of responsibility. The district court found that Lieberman's conduct differed "from the norm" in terms of the kind and degree of his acceptance of responsibility. It explained that it was departing downward one level because:

> [Lieberman] has affirmatively come forward, as soon as he was confronted and started making restitution. Admitted the full amount that he thought was owed, but indeed, has even agreed to a larger amount that the bank has asserted, including interest. He has done everything conceivable. Voluntary and truthful admission to the authorities. I don't know anything more that he could do....

App. at 47–48.

▮ In reviewing a court's decision to depart from the Guidelines, we first consider whether the grounds upon which it departed were permissible. *See United States v. Johnson,* 931 F.2d 238, 241 (3d

Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). A sentencing court must sentence within the applicable Guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988). If the circumstances relied upon by the sentencing court to justify departure were adequately considered by the Sentencing Commission, then its decision to depart must be reversed. *See United States v. Kikumura,* 918 F.2d 1084, 1098 (3d Cir.1990). Our review at this stage of the inquiry is plenary. *See id.*

 Acceptance of responsibility by a defendant is addressed in section 3E1.1 of the Guidelines, which provides: "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels." U.S.S.G. § 3E1.1(a).[4] The commentary to this section lists seven nonexclusive factors that are appropriate for a court to consider in determining whether to apply this section. The factors listed are "voluntary termination or withdrawal from criminal conduct or associations;" "voluntary payment of restitution prior to adjudication of guilt;" "voluntary and truthful admission to authorities of involvement in the offense and related conduct;" "voluntary surrender to authorities promptly after commission of the offense;" "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;" "voluntary resignation from the office or position held during the commission of the offense;" and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 1.

Inasmuch as many of the reasons given by Lieberman as justifying a downward departure are covered by this application note, we must consider whether the degree

of acceptance of responsibility may be used as a basis for departure. There is some indication from the Sentencing Commission that the scheme established by the Guidelines encompasses a departure for the degree of acceptance of responsibility. The Introduction to the Guidelines states:

> The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies *but where conduct significantly differs from the norm,* the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt.A 4(b), intro. comment (emphasis added). *See generally* Honorable Edward R. Becker, Flexibility and Discretion Available to the Sentencing Judge Under the Guidelines Regime, Fed. Probation, Dec. 1991, at 10, 11–12 (emphasizing that "the Sentencing Commission and Congress ... have *invited* departure in appropriate cases").

Section 5K2.0 of the Guidelines further states that a sentencing court "may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines ... if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." U.S.S.G. § 5K2.0, Policy Statement.

An illuminating law review article has recently explained,

> section 5K2.0 provides for two types of valid departures. One type is qualitative: a court may depart in the face of an aggravating or mitigating circumstance 'of a kind' not considered by the Commission. The other type is quantitative: a district court may base a departure on factors which, though considered by the Commission, are present 'to a degree' not frequently seen in connection with the offender and/or offense of conviction.

Honorable Bruce M. Selya & Matthew R. Kipp, An Examination of Emerging Depar-

---

4. The government does not dispute the district court's determination that Lieberman qualified

for the two-level decrease for acceptance of responsibility mandated by section 3E1.1.

ture Jurisprudence Under the Federal Sentencing Guidelines, 67 Notre Dame L.Rev. 1, 22 (1991).

Accordingly, courts "have recognized that a defendant's ameliorative post-arrest conduct may justify a departure even though section 3E1.1 rewards acceptance of responsibility." *Id.* at 37 (footnote omitted); *see United States v. Garlich,* 951 F.2d 161, 163 (8th Cir.1991) (where defendant liquidated his assets prior to indictment to ensure full restitution to banks, district court should have considered whether extent and timing of restitution were sufficiently unusual to warrant downward departure); *United States v. Sklar,* 920 F.2d 107, 116 (1st Cir.1990) (defendant's drug rehabilitation may serve as basis for downward departure when present "to a degree not adequately taken into consideration by the acceptance of responsibility reduction," but totality of circumstances in case not sufficiently unusual to warrant departure); *United States v. Carey,* 895 F.2d 318, 323 (7th Cir.1990) (unusual payment of restitution may warrant reduction in sentence beyond that granted by § 3E1.1, but departure not justified unless court determines that circumstances are unusual and present to degree substantially in excess of ordinary).

We conclude therefore that a sentencing court may depart downward when the circumstances of a case demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present.

■ It remains then to consider whether there was a sufficient basis for the district court's exercise of its discretion. The district court found that this case fell outside the heartland of cases to which § 3E1.1 applies primarily because Lieberman not only began to make restitution to the bank shortly after his embezzlement was uncov-

ered, but also entered into an agreement to pay about $34,000 more than he thought was owed and to which he pled guilty. Furthermore, in addition to Lieberman's admission of the full extent of his wrongdoing when confronted by bank officials, resignation of his position at the bank shortly after being confronted with the improper transactions, and voluntary and truthful admissions to the authorities, acts which would not take him out of the usual case, he met with bank officials to explain how they could detect improper transactions associated with the suspense account in the future.

Of course, the incidence of departure based on degree of acceptance of responsibility must necessarily be limited, lest the unusual case become the ordinary one. Nonetheless, we believe that Lieberman's post-offense ameliorative conduct adequately justified the district court's decision to depart downward based on the unusual degree of Lieberman's acceptance of responsibility. While another judge might not have done the same, we cannot say that it was an abuse of discretion. Thus, we will reject the government's challenge to that one-level departure.

### C.

### *Departure for Manipulation of Indictment Charges*

The government's final challenge is to the district court's two-level departure downward for manipulation of charges, an issue the district court reached after it determined that tax evasion and embezzlement charges could not be grouped.

■ The government is satisfied with the court's ruling on grouping, and Lieberman challenges it only if the two-level departure for manipulation is not upheld.[5]

---

5. The government argues, erroneously we believe, that there is a jurisdictional impediment to our reaching the grouping issue. It contends that the applicability of the grouping Guideline is not properly before us because Lieberman did not file a cross-appeal from his sentence. We are not persuaded. While a party may not seek more extensive relief on appeal than it received

in district court without filing a cross-appeal, an appellee may proffer alternative arguments to support the district court's decision without filing a cross-appeal. *See United States v. American Ry. Express Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 563–64, 68 L.Ed. 1087 (1924); *New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1205 (3d Cir.1991). By raising

Although we would ordinarily decide all offense level issues before discussing departure, in this case we will take the appeal as the government presents it to us rather than proceed first with Lieberman's alternative argument. Although we therefore assume, without deciding, that grouping was unavailable, an understanding of the departure issue requires some appreciation of the grouping issue.

The Probation Office recommended grouping Lieberman's embezzlement and tax evasion offenses under section 3D1.2, noting in the PSR that "if the government's thinking on [grouping] is correct, it could charge almost every case involving money, from postal fraud to bank robbery, with income tax evasion in order to enhance the sentence under the grouping rule." PSR at 17. The Sentencing Guidelines require grouping of offenses in order to avoid subjecting a defendant to double counting. Under section 3D1.2 of the Guidelines, certain "closely-related" counts are to be grouped:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> . . . . .

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

U.S.S.G. § 3D1.2.

The district court believed that grouping in this case was foreclosed under our decision in *United States v. Astorri*, 923 F.2d 1052, 1056–57 (3d Cir.1991), where we stated that a stockbroker who pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of income tax evasion, in violation of 26 U.S.C. § 7201, was not entitled to have those offenses grouped.

 Although Lieberman makes a plausible argument that a case involving tax evasion and embezzlement, which necessarily involves a taking of "moneys, funds, assets or securities," *see* 18 U.S.C.A. § 656 (West Supp.1992),[6] is distinguishable from a case involving tax evasion and wire fraud, which does not necessarily generate criminally-derived income by the taking of money or property, *see* 18 U.S.C.A. § 1343 (West Supp.1992),[7] we leave that issue for another day. We focus instead on whether the district court could base a downward

---

the grouping issue, Lieberman is not seeking to enlarge his relief under the district court's decision, but rather is proffering an alternative legal theory under which the district court's conclusion that Lieberman's sentence should not be affected by the fact that he was charged with tax evasion in addition to bank embezzlement may be upheld. *Cf. United States v. Bohn*, 959 F.2d 389, 394 (2d Cir.1992) (failure to file cross-appeal did not preclude government from raising contention that if sentence were reduced on grounds asserted by defendant, sentence on same count should be increased on different ground; court noting that "[r]equiring conditional cross-appeals in such circumstances ... would burden appellees (and courts) with no appreciable benefit to appellate practice").

6. 18 U.S.C.A. § 656 provides:

Whoever, being an officer, director, agent or employee of [a bank] ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank, branch, agency, or organization or holding company or any moneys, funds, assets or securities intrusted to the custody or care of such bank, branch, agency, or organization, .

or holding company or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both: but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

7. 18 U.S.C.A. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

departure on the fact that Lieberman was charged with both embezzlement and tax evasion of the amount embezzled.

The district court's departure on this basis was premised on "meeting the objectives of the sentencing guidelines and the [S]entencing [R]eform [A]ct." App. at 45. The court explained that in its experience, it had never before seen a defendant charged with both embezzlement and tax evasion for the moneys he embezzled. The court noted that while there was no prosecutorial misconduct, "the result of this highly unusual situation where a defendant is charged both with the embezzlement and with the tax evasion of the very same money that he embezzled is unusual and disparate and constitutes, albeit, not in bad faith, an inappropriate manipulation of the indictment, which the Sentencing Commission asserts that I can control through the use of departure power." App. at 44.

The government contends that the district court's downward departure for inappropriate manipulation of the indictment is foreclosed by our decision in *Astorri*. However, while *Astorri* did consider the construction of the *grouping Guideline* in a related context, nothing in *Astorri* forecloses the district courts from using their departure power to correct unwarranted sentencing disparities caused by charging decisions in those instances when grouping, which could also have compensated for the multiple charges, is unavailable. *Cf.* Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1705 (1992) (an unwarranted sentencing disparity is a disparity that "cannot be satisfactorily accounted for"). Indeed, Congress has required that the district courts "*shall* consider the need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct" in determining the particular sentence to be imposed in each case. *See* 18 U.S.C. § 3553(a)(6) (1988) (emphasis added).

We are mindful that 18 U.S.C. § 3553(b) requires the district courts to apply sentences within the Guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described [by the Guidelines]." However, there is no indication either that the Commission rejected the manipulation of the indictment charges as a basis for departure or that it intended to foreclose departures on this basis. On the contrary, a policy statement in the Introduction to the Guidelines states that the Sentencing Commission "recognized that a charge offense system has drawbacks" and that "a sentencing court may control *any* inappropriate manipulation of the indictment through use of its departure power." U.S.S.G., Ch. 1, Pt. A, (4)(a), Policy Statement (emphasis added).[8] The adjective "inappropriate" does not necessarily suggest bad intent on the part of the prosecutor, but can apply to prosecutorial zeal that results in charging a particular defendant disproportionately to others similarly situated. If we were to hold that district judges have no authority to depart on this basis, it would raise the prosecutor to a position supreme over the district judge vis-a-vis sentencing by virtue of the uncontrolled charging discretion. We believe that the Sentencing Commission did not so intend,[9] and we are unwilling to so hold.

It follows that a sentencing court possesses the authority to depart downward based on the manipulation of the indict-

---

**8.** While the government is correct that this policy statement lists as an example of manipulation of the indictment a situation in which several counts of the same crime are listed, the policy statement nonetheless indicates that the Commission is aware of the potential problem caused by manipulation of the indictment, and has invited the district courts to use their departure power to counteract it.

**9.** The Commission specifically stated that the "most important" drawback of the charge offense system is "the potential it affords prosecutors to influence sentences by increasing or decreasing the number of counts in an indictment." U.S.S.G. Ch. 1, Pt. A, (4)(a), Policy Statement.

ment.[10] Moreover, in departing by two levels, the district court followed our precedent in fixing the amount of departure by reference to an applicable counterpart in the Guidelines, in this case the two-level increase effected by the failure to group. *Cf. Johnson*, 931 F.2d at 241–42 (upholding three-level upward departure on ground that three victims assaulted, noting with approval district court's analogy to grouping Guideline in determining extent of departure); *Kikumura*, 918 F.2d at 1112 ("analogy to the guidelines is especially appropriate" in considering extent of departure). Thus, we reject the government's challenge to the departure on this basis.

### III.

#### *Conclusion*

We have concluded that the district court erred in determining that section 3B1.3 of the Guidelines covering abuse of position of trust was inapplicable. However, we have rejected the government's challenges to the district court's decision to depart downward based on Lieberman's unusual degree of acceptance of responsibility and the manipulation of the indictment. We will remand for resentencing in accordance with this opinion.

---

**10.** We note that an impressive array of commentators has recently emphasized the importance of the flexibility and discretion possessed by the district courts in using their departure power to arrive at sentences that are consistent with the purposes underlying the Sentencing Reform Act. *See, e.g.,* Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1739 (1992) (courts of appeals should encourage "trial judges to exercise discretion visibly" because "departures are an essential and respectable part of the system

Congress established, rather than evidence of noncompliance"); Donald P. Lay, Rethinking the Guidelines: A Call for Cooperation, 101 Yale L.J. 1755, 1765–66 (1992) (calling for "greater flexibility for the district courts to exercise discretion in making downward departures"); Marvin E. Frankel, Sentencing Guidelines: A Need for Creative Collaboration, 101 Yale L.J. 2043, 2050–51 (1992) (suggesting that "the power to depart *below the guidelines* ought to be more generously measured, certainly in these early years of the experiment" based on ancient principle of lenity).