

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-1994

# United States of America v. Monaco

Precedential or Non-Precedential:

Docket 93-5261

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Monaco" (1994). *1994 Decisions.* Paper 12.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/12

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-5261


UNITED STATES OF AMERICA,
Appellant

V.

THOMAS L. MONACO


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Criminal Action No. 92-00003-01)


Argued December 10, 1993

Before:  BECKER and NYGAARD, Circuit Judges,
and YOHN, District Judge*

(Opinion Filed May 10, 1994 )

EDNA B. AXELROD, ESQUIRE
ERIC L. MULLER, ESQUIRE (Argued)
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ 07102
Attorneys for Appellant

JOHN J. BARRY, ESQUIRE (Argued)
CAMILLE M. KENNY, ESQUIRE
Clapp & Eisenberg
One Newark Center
Newark, NJ 07102
Attorneys for Appellee

OPINION OF THE COURT


1

NYGAARD, <u>Circuit Judge</u>.

The government appeals from Thomas L. Monaco's sentence, contesting both the district court's application of, and its downward departure from the United States Sentencing Guidelines. For the reasons that follow, we will vacate the sentence and remand the cause to the district court.

The Oxy-Comm Contract

In July 1986, the Department of Defense ("DoD") awarded Northern Precision Laboratories, Inc. ("NPL") a contract to produce a test set for an aircraft pilot's oxygen/communications mask ("Oxy-Comm"). Payments were to be by periodic reimbursement for a fixed percentage of costs, overhead and other expenses incurred, with the balance of the fixed price to be paid upon completion. NPL's computerized accounting system was designed to track all costs incurred and assign them to the proper contract so progress payment request forms could be automatically generated. To receive a progress payment, these forms merely had to be submitted to the DoD. Although documentation for costs incurred was necessary in case of an audit, the form itself was sufficient for payment.

When NPL was awarded the Oxy-Comm contract, it was experiencing cash flow problems which made it difficult to satisfy NPL's working capital and net worth requirements under its loan agreements. To keep NPL's credit intact, its president

and founder, Thomas L. Monaco, contacted the Cortec Group, an investment banking firm. In 1985, Cortec loaned $250,000 to NPL in return for a $50,000 annual management consulting fee and stock warrants exercisable within five years.

Monaco decided that by billing labor to the Oxy-Comm contract before it was actually performed, he could improve NPL's cash flow situation. To receive accelerated payments, Monaco had NPL's Accounting Department change his son's department number from Administration to Engineering, a direct labor classification. Monaco directed his son to prepare labor sheets falsely indicating that he worked 1,000 hours on job number 845 since August 1986. Job number 845 corresponded to the Oxy-Comm contract, but Monaco's son did not know that. The elder Monaco gave the labor sheets to NPL's Production Control Manager to be put into the computer system. Monaco then submitted a false progress payment request to the DoD which included the extra hours reported by his son. Monaco and his son generated four additional progress payment requests by simply repeating the procedure. As a result of these false hours, NPL received approximately $140,000 in accelerated payments.

### The DESI Contract

NPL had earlier been awarded a subcontract from Sperry Corporation to produce a tracking system for NASA. It had received most of the payments under this fixed price contract. Unfortunately for NPL, because of technical problems with the system, more work remained to be done. Hoping to renegotiate the

Sperry contract and get paid for this work, NPL set up job number 1040 to track the additional expenses it incurred.

Later, the DoD awarded NPL a contract to develop a digital end speed indicator ("DESI") to monitor the speed of naval aircraft taking off from carriers. This fixed price contract was also payable under the progress payment system. For reasons that are unclear, the DESI contract was also assigned job number 1040.[0] Because of this numerical duplication, charges related to the Sperry overrun were billed to the DESI contract and resulted in improper progress payments. A year later, Monaco discovered the error. By then, NPL's financial condition had deteriorated to the point that it could not repay the money and Monaco permitted NPL to keep the unearned progress payments.

These acts nevertheless failed to help NPL's financial condition. Monaco realized that NPL would need additional backing to successfully bid on upcoming contracts and again sought help from Cortec. At Monaco's request, Cortec exercised the previously issued warrants. After assuming control over NPL Cortec immediately ousted Monaco. It then discovered the billing discrepancies and notified the authorities. A few months later, Cortec placed NPL in Chapter 7 bankruptcy. As a result of the bankruptcy, what would have been merely an interest free loan from early payments ripened into a loss of over $381,000 to the United States.

---

[0]Monaco states that he did not assign the job number himself and could only speculate as to how this double assignment occurred.

4

B.

Monaco and his son were indicted.  Monaco pleaded guilty to conspiracy, 18 U.S.C. § 371, and his son pleaded guilty to aiding and abetting a false statement.  Because part of Monaco's offense conduct took place after October 31, 1987,[0] sentence was imposed under the 1988 Sentencing Guidelines.[0] Beginning with a base offense level of six, the district court first added seven points under U.S.S.G. § 2F1.1(b)(1)(H) (1988) to reflect the size of the government's loss, then subtracted two points under section 3E1.1(a) for acceptance of responsibility. The court refused to apply the two-level enhancement for more than minimal planning, leaving Monaco with an offense level of eleven, which, with Monaco's criminal history category of I, would have resulted in a sentence of eight to fourteen months.

The district court then departed downward one additional level, making the following observations:

> [T]here is some substance to what
> [defense counsel] says when he speaks of the
> essence of the offense was not to take money
> that NPL or Mr. Monaco was not entitled to,
> but to expedite payment and cut a corner.
> Well, I don't know if I accept that analogy
> in that form; but what really happened here
> is, Mr. Monaco fraudulently borrowed the

---

[0]The younger Monaco's conduct was completed by November 1, 1987; hence, he was sentenced under pre-Guidelines procedure to one year of probation.

[0]3.  Under the 1988 guidelines, the loss caused by Monaco's fraud would require a seven point enhancement, while under the 1992 version, nine levels would be added.  Accordingly, the district court correctly chose to apply the 1988 guidelines.  See U.S.S.G. § 1B1.11(b)(1) (1992); United States v. Kopp, 951 F.2d 521, 526 (3d Cir. 1991).

Government's money without paying any interest on it, hoping that in the end, things would work out, complete the work, keep his company afloat. And he got a bad result; not something that is uncommon. . . . I believe Mr. Monaco's motives in this case were pure. I don't believe that he did this to place money in his own pocket. . . . Basically, Mr. Monaco is a good person, probably the type of neighbor anyone would want. . . .

But in any event, but for this mistake, we have a very decent human being standing before the Court. And so once again, this Court must strike a difficult balance in figuring out, well, what are we going to do with this decent human being who made a mistake, not that he could siphon off money for his own needs, but for his corporation? Is this the type of person that we want to put in a prison and a prison environment? . . . I'm satisfied from the totality of the events here that I'm not going to send Thomas L. Monaco to a prison setting. . . .

I'm going to depart downward . . . for all the reasons that [defense counsel] outlined. And the strongest reason, I think, is the fact that I wouldn't want to have to reflect that I engaged in conduct that caused my son to stand before this Court and be criminalized. The emotions and feelings that you're going to live with and the peace that you're going to have to make with yourself and within your family I think is something that the sentencing guidelines didn't take into account.

The court imposed a sentence of six months home imprisonment, five years probation, $100,000 in restitution and 500 hours of community service. The United States appeals both the application of the guidelines and the court's decision to depart downward.

6

II.

A.

U.S.S.G. § 2F1.1(b)(2) requires a two level increase when the offense involved more than minimal planning. "More than minimal planning" is defined in U.S.S.G. § 1B1.1, application note 1(f), which provides, in pertinent part:[0]

> "More than minimal planning" means more planning than is typical for the commission of the offense in simple form. . . .
>
> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.
>
> . . .
>
> In an embezzlement, a single taking accompanied by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

The district court determined that Monaco's planning was minimal because it was "a simple repetition of a simple plan" with "no more planning than inherent in the crime of fraud

---

[0]We are bound by the guidelines commentary in this case. "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 113 S. Ct. 1913, 1915 (1993). In is not argued in this appeal that any of the above exceptions apply.

itself."  In United States v. Cianscewski, 894 F.2d 74, 82 (3d Cir. 1990), we stated that the question of more than minimal planning was "better left to the district court;" nevertheless, we conclude it clearly erred in making the determination here.

It is first helpful to look at the nature of Monaco's fraud.  We will assume, without deciding, that the DESI fraud was purely opportune and focus on Monaco's conduct on the Oxy-Comm contract.[0]  It is undisputed that in late 1986 or early 1987, Monaco asked his son to prepare inaccurate labor sheets, which Monaco then had entered into NPL's computer system.  When the computer generated the progress payment request, Monaco signed it and turned it in to the DoD.  Paragraph 29 of the Presentence Report, to which Monaco made no objection in the district court, indicates that over the next few months he again enlisted the efforts of his son a total of four more times, repeating the fraudulent billing scheme.

The Progress Payment System is an honor system based largely upon voluntary compliance.  While complete records must be maintained in case of an audit, payments are made directly from progress payment requests, without supporting documentation.

---

[0]Monaco asserted that the improper charges to the DESI contract were at first accidental, but that when he discovered the problem, he decided to allow NPL to retain the money.  The Government, on the other hand, points to certain documentary evidence which purports to indicate that Monaco knew what was happening long before he claims to have discovered the error. The district court made no explicit finding as to which version of the events it credited, but the overall tenor of the sentencing colloquy appears more favorable to Monaco's position. Nevertheless, because we conclude the Oxy-Comm fraud alone provided sufficient evidence of more than minimal planning, we will not consider the DESI fraud further.

Monaco chose to have false hours input into NPL's computer system so that, at least ostensibly, the fraudulent progress payment requests would appear to be generated in the usual course of business. Had the DoD conducted an audit, it would have consequently been difficult to discover Monaco's fraud. This is one of the reasons why the enhancement for more than minimal planning is provided. See United States v. Wong, 3 F.3d 667, 672 (3d Cir. 1993); United States v. Georgiadis, 933 F.2d 1219, 1226 (3d Cir. 1991) (applying U.S.S.G. § 2B1.1(b)(5)).

Moreover, the district court found, in accordance with paragraph 29 of the Presentence Report, that Monaco's fraud was "a simple repetition of a simple plan" (emphasis added). According to guideline commentary, more than minimal planning is present in any case where repeated acts occur over a period of time. The only exception is when each act was "purely opportune," which has been appropriately defined as "spur of the moment conduct, intended to take advantage of a sudden opportunity." United States v. Rust, 976 F.2d 55, 57 (1st Cir. 1992) (citing United States v. Kopp, 951 F.2d 521, 536 n.22 (3d Cir. 1991)).

While the DESI fraud may well have fit the exception, the Oxy-Comm fraud clearly did not. It involved a series of discrete decisions by Monaco to turn in progress payment requests with inflated hours. At each stage, he had the opportunity to consider the wrongfulness of his actions. See Wong, 3 F.3d at 671; Georgiadis, 933 F.2d at 1226 (more than minimal planning adjustment "considers the deliberative aspects of a defendant's

9

conduct and criminal scheme").  Instead of ending the fraud, he
continued it.  This repetition makes the Oxy-Comm fraud very
similar to the example given in the commentary of a repeated
embezzlement accompanied by false bookkeeping entries.  Under
these circumstances, an enhancement for more than minimal
planning was required.[0]

Accordingly, we conclude that the district court
clearly erred when it found that Monaco did not engage in more
than minimal planning.  We turn now to the issue of whether a
downward departure was permissible.

B.

The district court also departed downward one level for
"all the reasons" argued by Monaco's counsel.  These reasons
included: (1) the amount of the true loss was overstated by the
Guideline's loss table; (2) the punitive effects of seeing one's
son hauled into court and adjudicated a criminal were not taken

---

[0]Monaco relies heavily on U.S. v. Maciaga, 965 F.2d 404 (7th Cir.
1992), but that reliance is misplaced.  There, a bank security
guard stole money out of the bank's night depository chute.  The
first time, he planned the theft.  Sometime later, he
inadvertently triggered the bank's silent alarm while performing
his normal duties.  After honestly explaining the situation to
the investigating police officers, he saw a second opportunity to
steal from the depository and did so.  The Court of Appeals for
the Seventh Circuit held that while the first larceny was
planned, the second was purely opportune, overturning the
district courts finding of more than minimal planning.  Id. at
407.  The Maciaga court noted that it could not find any case
where the more than minimal planning enhancement was applied to
less than three repeated acts of fraud.  Id.  Maciaga could only
be helpful to Monaco if the DESI fraud was purely opportune
(which we assume without deciding) and if there were somehow only
a single act of fraud surrounding the Oxy-Comm contract, which is
contrary to both the Presentence Report and the district court's
findings.

10

into account by the Sentencing Commission; and (3) other factors related to his offense and conviction, namely the loss of Monaco's business, his age, his poor prospects for future employment and inability to hold public office, the civil litigation in which Monaco was named as a defendant, and the long interval between the initial investigation and Monaco's indictment, which caused him to "live under a cloud."  We need only discuss items 1 and 2.[0]

1.

Monaco argues that, under the commentary to U.S.S.G. §2F1.1 (1988), a departure is permitted here.  Specifically, he points to application note 11 in the 1988 commentary, which stated, in pertinent part:

> In a few instances, the total dollar loss
> that results from the offense may overstate
> its seriousness.  Such situations typically
> occur when a misrepresentation is of limited
> materiality or is not the sole cause of the
> loss.  Examples would include understating
> debts to a limited degree in order to obtain
> a substantial loan which the defendant
> genuinely expected to repay; . . . and making

---

[0]The other grounds for departure are impermissible.  U.S.S.G. §5H1.1 states that age is not ordinarily relevant in departing from the guidelines.  We find nothing remarkable about Monaco's age of fifty-seven.  The loss of Monaco's business, his involvement in litigation, his poor prospects for future employment and his inability to hold public office are consequences common to many white-collar felons, and these factors were carefully considered by the Sentencing Commission. Moreover, the loss of Monaco's business, if anything, occurred despite, not because of, his fraud.  Likewise, many white collar defendants must wait considerable periods while their activities are investigated and brought before the grand jury.  Monaco argues that, even if each of these factors individually does not warrant a departure, the combination of all of them does make a departure appropriate.  We reject this collective argument as well.

> a misrepresentation in a securities offering
> that enabled the securities to be sold at
> inflated prices, but where the value of the
> securities subsequently declined in
> substantial part for other reasons.  In such
> instances, a downward departure may be
> warranted.

According to Monaco, the above note applies.  Although the United States ultimately lost over $381,000, Monaco argues that his intent was only to take an interest-free loan from the government and that it was Cortec's actions in taking over NPL and forcing it into bankruptcy that turned the advance into a total loss.  Monaco asserts that the seven-level enhancement of U.S.S.G. §2F1.1(b)(1)(H) (1988) overstates the amount of loss caused by his acts and hence overstates his criminal culpability.

We conclude that a departure based on overstatement of criminality by the loss tables is permissible.  Monaco's intent, as found by the district court, was not to steal money outright from the United States, but to expedite payments that would have been due at some future time and obtain a de facto interest-free loan.  Nevertheless, NPL failed and the United States suffered a considerable loss.  In United States v. Kopp, 951 F.2d 521, 531 (3d Cir. 1991), we defined loss as the greater of the amount the victim lost in fact and the estimated amount of the intended or probable loss.  We then went on to state that "[t]o the extent actual loss [has] other, more proximate causes, a discretionary downward departure . . . might be appropriate."  Id.  That may be the situation here.  Without the takeover of NPL by Cortec[0] and

---

[0]We note that NPL's lucrative DESI contract was taken over by another Cortec-affiliated company.

12

the subsequent bankruptcy, it is quite possible that the loss to the United States would have been far less than actually occurred. The district court needs to make findings of fact on this issue in order to support any departure on the ground of overstatement of criminality by the loss tables.[0]

We will accordingly remand, for two reasons. First, we cannot be sure whether the district court granted a downward departure based on application note 11, refused it based on an erroneous view of its power to depart, or refused it in the exercise of its sound discretion. Moreover, we simply do not know what choice the district court would have made had it known that the more than minimal planning adjustment was required. This too was within its discretion. Hence, we will remand to the district court for it to make appropriate findings of fact and

---

[0] At the sentencing hearing, counsel for Monaco argued that the "uniqueness" of the crime caused the monetary loss guidelines to overstate the seriousness of the offense. During the colloquy between the court and counsel, the court then stated to the Assistant United States Attorney:

> I agree with you. Its not a unique crime. You
> know, [you] can't have it both ways: It's
> either unique, or its simple and not complex.

Evidently, the court was saying that if Monaco's crime was "simple and not complex" for purposes of the "more than minimal planning" calculations, it could not be "unique" within the meaning of application note 11.

"Uniqueness," however, is not required before a district court can depart downward from the guidelines. All that is required is a mitigating circumstance not adequately taken into account by the Sentencing Commission in formulating the guidelines. See, e.g., United States v. Lieberman, 971 F.2d 989, 995 (3d Cir. 1992). If the district court meant by this statement that it had the power to depart only in unique circumstances, it erred.

13

resentence Monaco. On remand, the district court may, in its discretion, choose to depart downward based on application note 11.[0] See United States v. Stuart, No. 93-7361, slip op. at 9-11, 1994 U.S. App. LEXIS 7826, at *14-18, 1994 WL 133633, at *5-6 (3d Cir. Apr. 19, 1994) (suggesting possibility of downward departure where defendant's culpability as courier was potentially overstated by amount of stolen property he was carrying); United States v. Jackson, 798 F. Supp. 556, 557 (D. Minn. 1992) (exercising discretion and departing downward when sentencing perpetrator of fraudulent real estate appraisal scheme where other parties were largely responsible for loss).

## 2.

The other reason for the district court's departure was the mental anguish Monaco felt seeing his son, otherwise a law-abiding citizen with an excellent future, convicted of a crime because of his father's fraudulent scheme. The younger Monaco had completed successfully his graduate degree in Business Administration and could have no doubt looked forward to a career in the defense industry, but was restricted in that possibility by the criminal record he received. In addition, he was

---

[0]That discretion, however, is limited in two ways. First, the district court should not depart more levels than would have been required to account for the probable amount of foregone interest to the United States. Second, the court should consider the inherent risk of loss in Monaco's fraud. Although a total loss was not intended, it certainly did materialize and that risk is one of the losses that a perpetrator of fraud imposes on his victims. We do not think that such a wrongdoer should completely escape a sentencing enhancement if his scheme involved a substantial risk of loss merely because, under his own rosy scenario, no loss was intended.

stigmatized, not for deliberately committing a criminal act, but for dutifully and unquestioningly honoring his father's request. This is not at all what the elder Monaco intended for his son; the Presentence Report records that Monaco stressed the values of family, religion, education and a strong work ethic to his children and set an honest, law abiding example for them, with the sole exception of the offense conduct here. The district court believed that the distress and guilt that Monaco would feel as a conscientious father was punishment in itself, of a kind not adequately taken into account by the Sentencing Commission.

The government contends that the court erred because the involvement of a child in a parent's criminal endeavors is never a mitigating circumstance, but is instead an aggravating one. Indeed, a number of courts have approved enhanced sentences for defendants who brought children or younger relatives into their criminal activities. See, e.g., United States v. Ledesma, 979 F.2d 816, 822 (11th Cir. 1992); United States v. Jagim, 978 F.2d 1032, 1042 (8th Cir. 1992), cert. denied, 113 S. Ct. 2447 (1993); United States v. Porter, 924 F.2d 395, 399 (1st Cir. 1991); United States v. Christopher, 923 F.2d 1545, 1555-56 (11th Cir. 1991). These cases, however, all involved fairly egregious activities that the defendants must have known at the time were both criminal and would expose their family member to criminal liability, such as involving their children in the distribution of crack cocaine.[0]

---

[0] In Ledesma and Christopher, defendants involved their children in schemes to manufacture and distribute crack cocaine. 979 F.2d

15

Not all cases, however, contain such outrageous behavior. There are many types of federal offenses that make serious crimes out of behavior that might not appear to the average person to be particularly blameworthy. This is especially true given the often long reach of federal criminal jurisdiction, such as exists under the false statements and mail/wire fraud statutes. In certain factual situations, a defendant might not realize that the suborned conduct of his child would later cause the child to stand in court and be adjudged a felon.

In sum, we will not say that bringing a child into a criminal scheme is always an aggravating circumstance, especially when the defendant did not understand that what he or she was asking the child to do violated the law. The evaluation is too bound up in the facts and circumstances of each case and is best left to the sound discretion of the trial court. Thus, while the district court would not have abused its discretion if it had enhanced Monaco's sentence with an upward departure for bringing his son into the fraud, it certainly was not required to do so.

The government would have us conclude that involving one's child in a crime is never mitigating and bases its argument on U.S.S.G. § 3B1.3, which provides that when a defendant abuses a position of trust, the sentence should be adjusted upward by

---

at 819; 923 F.2d at 1556. The defendant in Jagim invited his nephew to participate and profit in a fraudulent tax shelter scheme. 978 F.2d at 1036. In Porter, defendant urged his son to rob a bank in order to raise money for defendant's bail. 924 F.2d at 399.

16

two levels.  While not arguing for that specific adjustment here, the government contends that the Sentencing Commission fully considered the moral gravity of employing one's child in a crime, thus making a downward departure unavailable.  We disagree.

The application notes to the 1988 version of U.S.S.G. §3B1.3 are not entirely clear, but their overall tenor appears to encompass the relationship of employer and employee, not parent and child.  Any doubt is resolved by reference to the 1993 application notes, which define a position of public or private trust as involving "professional or managerial discretion." U.S.S.G. § 3B1.3, application note 1 (1993).  No mention is made at all of nonbusiness positions of trust.[0]  Moreover, likening the criminalization of a child to an abuse of trust misrepresents the rationale behind the section 3B1.3 enhancement, which is that a person who uses a special position of trust to commit a crime is likely to be more difficult to apprehend and prosecute than the average criminal.  Lieberman, 971 F.2d at 993.  Employing one's child in a criminal scheme generally does not make concealment of the offense itself any easier.

In at least some cases, such as the district court found here, a defendant who unwittingly makes a criminal of his child might suffer greater moral anguish and remorse than is typical.  Accordingly, even though the Eleventh Circuit Court of

---

[0]The 1993 Sentencing Guidelines are not strictly applicable to this case; however, we are not applying the 1993 guidelines commentary by their own terms.  Rather, we are referring to them to infer whether the Sentencing Commission considered the issue of a parent recruiting a child into a criminal scheme when it promulgated the 1988 version of U.S.S.G. § 3B1.3.

17

Appeals in Ledesma held in the alternative that a section 3B1.3 enhancement was appropriate for bringing a child into a drug conspiracy, see 979 F.2d at 822, we think the Sentencing Commission did not consider this issue when it promulgated the guidelines.

Moreover, we do not believe that by promulgating U.S.S.G. § 5H1.6, the Sentencing Commission foreclosed the possibility of a downward departure in this extraordinary situation. That section specifically states that family ties and responsibilities are "not ordinarily relevant" for departure purposes. "Not ordinarily relevant" is not synonymous with "never relevant" or "not relevant." Cf. U.S.S.G. § 5H1.10 (race, sex, national origin, creed, religion and socio-economic status). Indeed, as we recognized in United States v. Higgins, 967 F.2d 841, 845 (3d Cir. 1992), when a "not ordinarily relevant" factor can be characterized as "extraordinary," a district court has the power to depart from the guidelines. See also United States v. Headley, 923 F.2d 1079, 1082-83 (3d Cir. 1991); United States v. Johnson, 964 F.2d 124, 128-29 (2d Cir. 1992). Moreover, in United States v. Gaskill, 991 F.2d 82, 85 (3d Cir. 1993), we opined that section 5H1.6 is not "a clear prohibition, but rather an indication that exceptions should be invoked only where the circumstances are not 'ordinary' or 'generally' present."

We think this case is sufficiently extraordinary to support the district court's downward departure from the guidelines. U.S.S.G. § 5H1.6 questions typically arise when a parent of young children is facing a prison term and argues that

18

his or her family responsibilities either weigh against imprisonment or militate in favor of a shorter sentence. Because leaving children behind while in prison is a hardship common to many convicted parents, courts refuse to allow downward departures. See United States v. Shoupe, 929 F.2d 116, 121 (3d Cir.), cert. denied, 112 S. Ct. 382 (1991); Headley, 923 F.2d at 1082–83.

In the unusual facts and circumstances of this extraordinary case, however, it is entirely probable that Monaco never intended to criminalize his son and was deeply and legitimately shocked and remorseful when it happened.[0] This is not something that is likely to occur frequently, and when it does, the interests of justice weigh more heavily against overpunishing the defendant than they do in favor of rigidly enforcing the guidelines without regard for legitimate penological bases of sentencing.[0] For example, in Gaskill, where we approved a departure under section 5H1.6, the defendant was the sole caregiver for his mentally ill wife. 991 F.2d at 83. He was not a violent offender and unlike the situation in Headley, where a long sentence was involved, a reasonable downward departure would have made a major difference in his

---

[0]We have no doubt that Monaco himself knew that what he was doing was wrong. It is quite possible, and would not be entirely surprising, that Monaco had no idea that the "favor" he asked of his son would cause the son to be convicted of a federal felony. What he asked was a lie to be sure, but as a nonlawyer, it is quite likely that he did not suspect that the conduct amounted to aiding and abetting a false statement under federal law.
[0]See Edward R. Becker, Flexibility and Discretion Available to the Sentencing Judge Under the Guidelines Regime, Federal Probation, Dec. 1991, at 10, 13.

19

period of incarceration and allowed him to quickly return to his family duties. Id. at 85-86. Here too the defendant is a productive, non-violent offender and a small downward departure would eliminate the need for incarceration entirely.

The government's final argument against the downward departure is that it would contravene United States v. Newby, 11 F.3d 1143 (3d Cir. 1993). There, we held that the loss of good time credits arising from a prison altercation was not a mitigating factor warranting a downward departure for the associated criminal charge of assaulting and interfering with a prison guard. That is to say, merely because a prisoner faces the prison's administrative penalties for rule infractions, he cannot thereby accrue a mitigating benefit in a criminal sentence flowing from the same act or acts.

We held there that because criminal sentences and disciplinary sanctions are designed to serve different purposes, such a departure would defeat the goals of the criminal justice system by giving incarcerated defendants lesser sentences than they deserved. Id. at 1148-49. Therein we stated:

> In addition to not being considered by the Commission, a circumstance must be a mitigating one in order to provide a basis for a downward departure. The gravamen of a mitigating circumstance is that it somehow reduces the defendant's guilt or culpability. It is a circumstance that "in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability." Black's Law Dictionary 1002 (6th ed. 1990).

Id. at 1148.

The government argues from this that because Monaco's guilt is not diminished by involving his son, any anguish he feels at seeing his son convicted is not mitigating. The government's interpretation, however, would be inconsistent with our earlier decisions in United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993) and United States v. Lieberman, 971 F.2d 989 (3d Cir. 1992).

In Gaskill the fact that the defendant was the sole source of care for his mentally ill wife did not bear on his level of guilt or culpability in fraudulently using social security numbers to obtain things of value, yet we held that a downward departure was permissible. Gaskill's situation could be described as either "extraordinary" or "extenuating." In Lieberman we permitted a downward departure where the prosecution's manipulation of the indictment made grouping of two related offenses under the guidelines impossible. We did this not because the defendant was less blameworthy than other defendants, but to prevent "rais[ing] the prosecutor to a position supreme over the district judge vis-a-vis sentencing by virtue of the uncontrolled charging discretion." 971 F.2d at 998. It is evident, then, that reduced moral culpability is not the only permissible basis for a downward departure.[0]

---

[0] See also United States v. Rivera, 994 F.2d 942, 952-54 (1st Cir. 1993) (permitting departure in extraordinary familial circumstances); Johnson, 964 F.2d at 128-30 (same); United States v. Lopez, 938 F.2d 1293, 1296 (D.C. Cir. 1991) (departure based on age of defendant permissible in extraordinary cases); Shoupe, 929 F.2d at 120 (same); United States v. Big Crow, 898 F.2d 1326, 1332 (8th Cir. 1990) (approving departure based on defendant's "excellent employment history, solid community ties, and

21

Moreover, the Guidelines themselves are replete with offender characteristics that will, at least in extraordinary circumstances, support a departure, none of which are normally indicative of reduced guilt or culpability. See U.S.S.G. §§5H1.1 (age), 5H1.2 (education and vocational skills), 5H1.4 (physical condition), 5H1.5 (employment record), 5H1.6 (family ties and responsibilities), 5H1.11 (prior good works). Indeed, among the most significant of the non-culpability related grounds for departure is U.S.S.G. § 5K1.1, Substantial Assistance to Authorities, particularly section 5K1.1(a)(4), which provides for a departure based on the amount of risk or injury suffered by the defendant of his or her family as a result of cooperating with the government. Plainly, this factor has nothing whatever to do with the defendant's culpability in committing the crime itself, yet the commentary states explicitly that assistance to authorities has been recognized as a mitigating factor.

In addition, the Guidelines Manual explicitly states (and has consistently stated over the years) that, except for a few circumstances unrelated to culpability where a departure is impermissible, "the Commission [did] not intend to limit the kinds of factors, whether or not mentioned elsewhere in the guidelines, that could constitute grounds for departure in an unusual case. See, e.g., United States Sentencing Commission Guidelines Manual 6 (1993). The implication, of course, is that

---

consistent efforts to lead a decent life in a difficult environment).

22

certain factors unrelated to guilt may be relevant for departure purposes in extraordinary circumstances.

Internal Operating Procedure 9.1 sets forth our judicial tradition that no panel of this court may overrule the holding of a previous panel. Only the in banc court may do that. To the extent that the decision of a later panel conflicts with existing circuit precedent, we are bound by the earlier, not the later, decision. Yohannon v. Keene Corp., 924 F.2d 1255, 1263 & n.8 (3d Cir. 1991). Thus, to the extent that Newby's pronouncement on moral culpability can be read to implicitly overrule decisions such as Gaskill and Lieberman, the Newby language must be considered dictum.[0] See United States v. Ricks, 5 F.3d 48, 50 (3d Cir. 1993) (per curiam). Accordingly, nothing in Newby prevents a downward departure in this case.

We believe that Monaco's situation is sufficiently extraordinary and is sufficiently extenuating to support the district court's discretionary decision to depart from the guidelines. Having concluded that the district court correctly departed downward, we cannot affirm its sentence outright. How much to depart is quintessentially a question of discretion, and while the district chose to depart downward one level, that decision was made at a time when the court believed that the two-

---

[0] We do not, however, disturb Newby's holding that loss of good time credits do not warrant a downward departure. As noted above, we construe Newby as focusing primarily on the fact that because criminal sentences and disciplinary sanctions are designed to serve different purposes, a departure would defeat the goals of the criminal justice system by giving incarcerated defendants lesser sentences than they deserved.

point enhancement for more than minimal planning was not required.  We simply do not know how many levels, if any, the district court would have departed.  We will therefore remand for the district court to exercise its discretion in this regard.

### III.

Because the district court incorrectly found that the more than minimal planning enhancement did not apply to Monaco, we will vacate its judgment of sentence and remand for resentencing in light of our holding that a downward departure is permissible on the facts of this case.