**UNITED STATES of America**

v.

**Abe MURAD, Roy Murad and Allen Stern.**

**Crim. No. 2:94–cr–54.**

United States District Court, D. Vermont.

Jan. 29, 1997.

776

R. Jeffrey Behm, Sheehey Brue Gray & Furlong, Burlington, VT, for defendant Abe Murad.

Robert Francis O'Neill, David R. Putnam, Gravel & Shea, Burlington, VT, for defendant Roy Murad.

Thomas J. Sherrer, Eastman & Sherrer, P.C., Burlington, VT, for defendant Allen Stern.

Paul J. Van de Graaf, Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S.

## OPINION AND ORDER

SESSIONS, District Judge.

The Defendants entered guilty pleas to conspiracy to commit bankruptcy fraud on March 23, 1995. Presentence reports (PSRs) were written for each defendant. The PSRs assessed to each Defendant a loss figure of $900,398.74 and recommended that a number of sentencing enhancements be assessed. Defendant Abe Murad was given two points for more than minimal planning, two points for violating a judicial or administrative order under § 2F1.1(b)(3) of the Sentencing Guidelines, and four additional criminal history points for being a leader or organizer of criminal conduct which involved five or more persons or was otherwise extensive. Defendant Roy Murad was assessed two points for more than minimal planning, two points for violating a judicial or administrative order, and three points for being a manager or supervisor of such conduct, which involved five or more participants or was otherwise extensive. Roy's PSR also advocated a two-point enhancement for obstruction of justice. In addition, the reports recommended that Abe and Roy Murad not receive credit for acceptance of responsibility. Defendant Allen Stern's PSR assessed two points for more than minimal planning, no credit for acceptance of responsibility, and three points for being a supervisor or manager of criminal conduct involving five or more participants or which was otherwise extensive. Each defendant objected to the loss figure, the enhancements recommended by the probation officer, and the denial of credit for acceptance of responsibility. Each defendant has also moved for downward departure on a variety of grounds.

The Court held hearings over twelve days on the various issues raised by the Presentence Reports and the objections filed by the defendants. Based upon the evidence introduced at that hearing, together with arguments of counsel and the memoranda filed by the parties, the Court makes the following findings.

## I. LOSS CALCULATION

■ The offense level for a fraud crime is based upon the dollar amount of the loss caused by the fraud. U.S.S.G. § 2F1.1(b)(1)(K). Generally, loss is defined as the fair market value of the property that was the subject of the fraud. U.S.S.G. § 2F1.1, Application Note 7. In matters involving bankruptcy fraud, the value of the loss is based upon the preliquidation value of inventory and accounts receivable. *See United States v. Levine,* 970 F.2d 681, 690 (10th Cir.), *cert. denied,* 506 U.S. 901, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992). It is the Government's burden to prove the loss by a preponderance of evidence. The court need not determine the loss with precision but is to make a reasonable assessment of the loss given the available information. *See United States v. Reese,* 33 F.3d 166, 174 (2d Cir. 1994), *cert. denied,* 513 U.S. 1092, 115 S.Ct.

756, 130 L.Ed.2d 655 (1995); U.S.S.G. § 2F1.1, Application Note 8.

■ U.S.S.G. § 1B1.3(a)(1) defines the circumstances under which defendants are held responsible for the loss created by others. Loss figures extend to:

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. . . .

Under subsection (B), a defendant is responsible for the loss caused by the acts or omissions of accomplices if such acts were committed in furtherance of jointly undertaken criminal activity and could reasonably have been foreseen by the defendant. In such cases, the court must make a particularized finding that the scope of the criminal activity was agreed upon by the defendant and that the activity was foreseeable. *United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995).

■ The Government seeks to attribute all of the losses in this case to each of the three Defendants under both provisions of § 1B1.3. The Government argues that all three defendants engaged in executing a coordinated plan to defraud BNP and the Bankruptcy Court. Under the Government's theory, each Defendant knowingly aided the others in each part of the fraud, or, in the alternative, each defendant knew and agreed to the full scope of the conspiracy to defraud the BNP and the Bankruptcy Court, and each instance which resulted in a loss could be reasonably foreseen by each defendant. The Court disagrees, particularly in the case of Allen Stern. The Court does not believe that this conspiracy was particularly well-coordinated or that each defendant was aware of its scope or the activities of the other members. Rather, the evidence suggests that each member was reacting in a crisis mentality to stave off loss of the business and that, to a varying degree, each was acting independently. As a result, the Court will address each category in which loss is attributable to each defendant to determine both the amount of the loss and to assess individual responsibility for that loss.

## A. COOK NOOK AND FLATWARE SETS TO JEMAFLEX

■ In 1990, Housecraft began marketing 32–piece cook nook sets which consisted of three plastic bowls, four plastic canisters, lids and numerous measuring spoons and kitchen implements. The bowls and canisters were manufactured in Mexico by Jemaflex and related companies, and the spoons and kitchen gadgets were manufactured in China. Prior to August 1991 and for as long as one year, Housecraft had a significant number of cook nook sets in a large pile generally referred to as "Cook Nook Mountain". In the summer of 1991, Stern directed Eli Hakey to prepare the cook nook sets for shipping to Jemaflex. Jemaflex was a Mexican company headed by Bernardo Waiss, the father-in-law of Joe Murad. Joe Murad was Abe Murad's third son and was employed in marketing and sales for Housecraft/Robojo during much of the relevant period. Stern instructed Hakey that the bills of lading were to be handwritten rather than typed, which was the standard operating procedure. The bills of lading were to go "directly to [Stern] and no one else." III Tr. 156; Ex. 141. Eleven container loads of cook nook and flatware sets were sent to Jemaflex in August 1991. No purchase orders preceded the shipping, and Housecraft never issued invoices for the merchandise.

Defendants argue that the shipments to Jemaflex represented a return of defective goods. However, Eli Hakey testified that most of the cook nook sets were not defective. Housecraft had received a number of shipments of thousands of cook nook sets from Jemaflex in 1990, all of which were paid

for by Housecraft. No evidence was introduced that any shipments of cook nook sets were received by Housecraft from Jemaflex in 1991. Finally, Housecraft listed in its inventory over 16,000 32–piece cook nook sets ready to ship on May 31, 1991, and only 100 on October 29, 1991. Housecraft records indicated that the company had shipped about 6,000 sets to Sears and an additional small number of sets to other customers between June and October 1991. Records also reveal that the St. Albans plant had received about 6,000 sets from a warehouse in September 1991, presumably to be used to fill the Sears order. Therefore, aside from shipments to Jemaflex, Housecraft's inventory of cook nook sets remained relatively constant. It is clear from the evidence that Housecraft had thousands of cook nook sets at its factory in August 1991 located within "Cook Nook Mountain" that were not defective, that had been paid for, and that were sent to Jemaflex for the purpose of concealing assets of the company from BNP and the Bankruptcy Court.

Abe Murad testified to intimate knowledge of the transaction in which the cook nook and flatware sets were sent to Jemaflex. He directed and/or assisted in the diversion of assets, and, therefore, the loss caused by this diversion of assets is attributable to him. Further, his testimony at trial concerning the return of these sets was not truthful.

▪ There is no evidence that Roy Murad directly ordered that the shipment of the cook nook and flatware sets be made to Jemaflex. However, Roy Murad was the person most responsible for the financial operation of the business. He was intimately aware of the financial health of Housecraft, including the status of the inventory and accounts receivable. It is inconceivable to the Court that he would not have been consulted concerning the concealment of such a large amount of assets of the corporation. Therefore, the Court finds the loss caused by the transfer of these assets to Jemaflex to be correctly attributable to him.

▪ Finally, Allen Stern was the manager at the Housecraft factory in St. Albans. He directed the employees to ship the sets to Jemaflex and ordered that steps be taken to prevent disclosure of the shipments to others. He actively assisted in this aspect of the fraud. The loss is justifiably attributed to him.

▪ The amount of the loss is in dispute. In August 1991, 30,582 cook nook sets and 3,846 flatware sets were shipped to Jemaflex. The PSR valued the cook nook sets at $7.00 each. However, there was testimony that the sets were assembled from a large pile within the factory and that sometimes the colors of the individual pieces did not match. Eli Hakey testified that approximately one-fourth of the sets were incomplete. The cook nook sets sold for $6 to $10 prior to the bankruptcy filing. As a result, the Court finds that a reasonably conservative estimate of the value of complete cook nook sets is $4 and of incomplete sets is $2. The total amount of loss arising out of the shipment of the cook nook sets is $107,037.

The PSR used the wholesale list price of $7.50 per set for the 20–piece flatware with trays. Housecraft had sold the sets for prices ranging from $6 to $7.50 prior to the bankruptcy filing. The Court assesses the value of the flatware sets at its most conservative number, that is, $6 per set. The total loss from the shipment of the flatware sets is $23,076. The total combined loss is $130,113.

### B. STATE STREET CHECKS TO JEMAFLEX

▪ In September 1991, Housecraft sent checks totaling $145,000 written on the State Street account and payable to Jemaflex. The checks were written at the direction of Abe Murad, ostensibly for payment for earlier shipments.

At the outset, the checks constitute bankruptcy fraud regardless of whether the money was owed to Jemaflex. Housecraft filed under Chapter 11 of the Bankruptcy Code in October 1991. The checks to Jemaflex constitute an illegal preference, thereby defrauding the court and other creditors of assets of the bankrupt estate. The full amount of that loss is therefore attributable to the participants in that fraud.

In addition, documents introduced at the sentencing hearing establish beyond any doubt that Housecraft did not owe Jemaflex any money at the time the checks were drafted. *See* Gov't Exh. 161. Howard Hoppenheim reviewed all of the invoices going back to 1988 and reconciled all checks from Housecraft or Robojo to Jemaflex with those invoices. Robojo had five outstanding invoices slightly in excess of $91,000. That debt was paid by shipment of goods from Robojo to Jemaflex in the summer of 1991. Housecraft had no outstanding invoices with Jemaflex.

The Court concludes that the $145,000 check to Jemaflex in September 1991 represented another effort by Abe and Roy Murad to divert Housecraft assets out of the bankrupt estate. The Court notes that Bernardo Waiss lent $150,000 to his daughter and son-in-law, Joe Murad, three months later. Those funds were secured by a mortgage on Mr. Waiss's daughter's real estate. Eventually the money was used as an equity infusion into the Murad's next business, 142/A & R. The Court need not decide whether that $150,000 "loan" was merely the return of the money diverted to Jemaflex from Housecraft assets. The diversion of $145,000 to Jemaflex is sufficient to justify assessment of those losses to the pertinent participants in the scheme.

■■■■ The $145,000 loss is attributable to Abe and Roy Murad. Abe was directly responsible for the scheme to divert these assets. In the summer of 1991, Roy was intimately involved in all financial issues relating to Housecraft and the State Street account. Roy admitted to withdrawing $85,000 from the State Street account to divert into 142/A & R in October. He also was the member of the family who was dealing directly with BNP on issues relating to the financial position of Housecraft. He participated fully with Abe on all major business decisions during this period. Despite Roy Murad's testimony to the contrary, the Court finds that he had full knowledge of and participated in the diversion of these funds to Jemaflex. The Court also finds that even if Roy had no actual knowledge of the $145,000 checks, his active participation in the conspiracy to divert assets from Housecraft to 142/A & R, and his agreement to its scope put him in a position to reasonably foresee efforts by others within the family to transfer these moneys.

■■■ Allen Stern testified that he had no knowledge of the $145,000 check to Jemaflex. Stern was responsible for production and had little involvement in financial decisions affecting Housecraft. Although he may have told a bookkeeper that the check was for purchases from Jemaflex, there is no evidence indicating that he participated in the decision to divert the funds or even knew that the check was to be sent. Unlike Abe and Roy Murad, he did not participate in the company's financial decisions. The $145,000 loss is not attributed to Stern.

## C. $85,000 IN STATE STREET CHECKS

Roy Murad and Allen Stern admitted to diverting $75,000 and $10,000 respectively from Housecraft's State Street account in October 1991. The funds were channeled through their personal accounts and contributed to 142/A & R. Both defendants participated in this scheme to transfer funds from Housecraft to 142/A & R. The full $85,000 loss is attributed to both defendants.

■■■ Abe Murad testified that he did not know of the $85,000 withdrawal from the State Street account. Like Roy Murad, Abe was intimately involved in Housecraft's financial affairs. Roy and Abe shared in the common purpose of diverting Housecraft assets to 142/A & R through various means. Even if Abe did not specifically know of these withdrawals, he was fully aware of and participated in schemes for diversion of assets. In light of his active role in 142/A & R, it is also inconceivable that Abe would not have known about the infusion of $85,000 into his new business. The Court finds that the diversion of $85,000 was clearly foreseeable by Abe in light of his joint activities with Roy to siphon off Housecraft assets to 142/A & R. In the alternative, Abe Murad agreed to the full scope of the conspiracy and could have clearly foreseen efforts to divert moneys to

142/A & R by other family members. The $85,000 loss is attributable to Abe Murad.

## D. NOVEMBER AND DECEMBER SHIPMENTS TO 142/A & R

 In late September or early October 1991, the Murad family met with Stephen Langsner and Kerry Ludmer at Abe Murad's residence to create a new company. Langsner and Ludmer had been trusted employees. The Murads and Stern indicated at this meeting that a new business was to be created under the name of Abraham & Rose (A & R). Langsner and Ludmer were asked to figurehead the company in the place of the Murad family because of the financial circumstances surrounding Housecraft's bankruptcy, although it was clear to all at the meeting that the Murads were to be in charge of the company. One of the purposes of the new company was to receive diverted assets from the bankrupt estate of Housecraft. Langsner and Ludmer both confirmed the arrangement in testimony offered to the Court. Subsequent events substantiated the Murad's control over the new company, including Abe's role in negotiating lease space and the use of Robojo funds to finance the business. All three Defendants worked at A & R's offices at 50 Montee de Liesse, with Abe and Roy sharing the largest office.

The Defendants differed in their descriptions of control over Abraham & Rose. Abe Murad and Allen Stern testified that Langsner and Ludmer were in fact to be in charge of the company and that they were merely employees until December 1991. Roy had testified before the Bankruptcy Court that 142/A & R was merely a Housecraft customer and that the Murads had no control over the business. At the sentencing hearing, Roy acknowledged misleading the Bankruptcy Court concerning control over 142/A & R. He testified that the Murads did control the new business and that such control was concealed from the Bankruptcy Court.

The Defendants orchestrated eight shipments of Housecraft assets to 142/A & R during the fall of 1991. Three of those shipments were disclosed to the Bankruptcy Court, although the disclosure falsely represented that 142/A & R was merely a customer and that the Murads did not have a controlling interest in the company. Housecraft did not receive payments from 142/A & R for these shipments, resulting in a loss to the bankrupt estate. In addition, there were five undisclosed shipments, although the Defendants were fully aware of their obligation to inform the Bankruptcy Court of any shipments made by Housecraft. These undisclosed shipments were a part of the Defendants' efforts to divert Housecraft assets to their new business, thereby defrauding Housecraft's creditors.

The PSRs assess the amount of loss based upon the invoice amounts from the eight shipments. The total is $90,639. The Court finds that this loss figure is accurate.

All three Defendants participated in the scheme to divert Housecraft assets to 142/A & R. All three were present at the meeting in which the new company was created. They were aware of and either participated in shipments made to 142/A & R from Housecraft or acted to prevent disclosure of the shipments to the Bankruptcy Court. As a result, the entire loss figure of $90,639 is attributable to all Defendants.

## E. F.W. MYERS WAREHOUSE

 In the fall of 1991, the Murad family leased a bonded warehouse in upstate New York. Eli Hakey and Don Gadue located the warehouse at the request of Allen Stern. On the day of the filing of the bankruptcy petition, Abe Murad and Allen Stern shipped Housecraft glasses and knives to the warehouse without listing those assets on the petition. According to invoices, the value of those assets was $38,380. Abe and Stern never disclosed those assets to anyone, including the Bankruptcy Court. They secretly transferred those assets to 142/A & R in January 1992.

Abe Murad and Allen Stern were direct participants in the diversion of Housecraft assets to F.W. Myers. Stern helped locate the warehouse. Abe Murad testified that he was aware of the goods at the warehouse and attempted to explain the transfer to 142/A & R as a sale as evidenced by a $30,000 invoice. The invoice which Abe relies upon preceded

the transfer by one month and is for a value different than that of the glasses or knives. The Court finds that Abe Murad's testimony concerning the "sale" of these assets to 142/A & R as evidenced by this invoice not credible. Rather, the Court concludes that the shipment of Housecraft merchandise from F.W. Myers to 142/A & R in January 1992 was intended to illegally divert Housecraft assets. The loss is therefore attributable to Abe Murad and Allen Stern.

■■ Roy Murad testified before the Bankruptcy Court on a number of occasions concerning the status of Housecraft assets. It is not credible that he would have been unaware of the existence of assets located in a warehouse in New York state. In light of his active participation in the scheme to divert Housecraft assets to 142/A & R, it is clear that either he knew of the transfer of these assets or such a transfer was reasonably foreseeable to him. Therefore, he is assessed the $38,380 loss.

### F. JANUARY SHIPMENT TO PLATTSBURGH

■■ In January 1992, Allen Stern ordered Eli Hakey and other employees of Housecraft to ship various pieces of equipment which were owned by Housecraft to Plattsburgh, New York. The equipment consisted of: (1) an Orange BT Lifter, (2) a yellow Hyster Electric Truck, (3) a Slautteback glue gun, (4) glass cutters, (5) a Potdevin Glue Machine, (6) a mirror framing table, and (7) assorted tools. At the time of this shipment, Stern knew that he needed court approval. He failed to notify the Bankruptcy Court or the court-appointed monitor of the shipment of these Housecraft assets to Plattsburgh.

The value of the equipment was hotly contested, and prompted rigorous cross-examination by defense counsel of the Government's value expert, Emile Sylvestre. Originally, Mr. Sylvestre established a value at $25,000. During cross-examination, that figure was reduced to $15,000 and then · $10,-000. The Court will assess the most conservative value to the equipment, $10,000.

Stern ordered the shipment of the equipment to Plattsburgh and is therefore responsible for the loss. Abe Murad testified falsely that this equipment was purchased by 142/A & R, thereby indicating his knowledge of and participation in the shipment. Finally, the equipment was shipped to Plattsburgh to start a mirror framing assembly line for 142/A & R. In light of Roy Murad's active involvement in 142/A & R in January 1992 and the importance of this projected mirror framing assembly line to that business, the Court finds that he must have known about and participated in the shipment of this equipment. Alternatively, Roy was aware of and agreed to the full scope of the conspiracy to divert assets and could have reasonably foreseen this shipment. As a result, all Defendants are assessed the $10,000 loss.

### G. KMART AND WOOLWORTH ACCOUNTS RECEIVABLE ("A/R") FRAUD

■■ Beginning in mid–1990, the Defendants recognized the severity of Housecraft's financial difficulties and its continued dependency upon bank loans. They engaged in a concerted effort to inflate Housecraft's accounts receivable in its financial disclosures to BNP and eventually the Bankruptcy Court. Those inflated accounts receivable caused the Bankruptcy Court to extend cash collateral for an additional three months, resulting in additional losses of $25,404 to the bankrupt estate and $39,680 in expenses for a court-ordered monitor.

#### 1. Kmart A/R

Abe and Roy Murad listed approximately $1.2 million in Kmart accounts receivable during bankruptcy proceedings. They created these accounts receivable by manufacturing seventeen fictitious invoices. Richard Dale, Housecraft's Kmart broker, was monitoring all shipments between Housecraft and Kmart. According to his records, those seventeen invoices were false. Representatives of Kmart's accounts payable department informed the FBI that they had no evidence of these invoices. Housecraft contacted Dale on a number of occasions concerning legitimate accounts receivable, but never ad-

dressed the false invoices. This is particularly significant in light of the cash-poor status of the business. Certainly if those invoices were valid and the accounts receivable accurate, the Murad family would have sought collection. Further, Eli Hakey, who was employed in Housecraft's shipping department, kept track of all Kmart shipments. None of the seventeen fictitious invoices is reflected in Hakey's records.

In the summer of 1991, Scott Weinheimer investigated the Kmart receivables. He attempted to reconcile the shipping records with those accounts receivable. He could not find any shipping records to verify the accounts receivable.

Roy Murad testified in the Bankruptcy Court that the Kmart receivables were accurate. Later, he was to testify in this Court that the Kmart accounts receivable were suspicious, although he did not investigate whether they were reliable. The Kmart shipping records had been kept in St. Albans. Examination of those records could have disclosed the on-going fraudulent activities of the Murad family. Allen Stern instructed Hakey to remove the Kmart records on a weekend to Hakey's home. Hakey eventually transferred the records to Don Gadue who gave them to Roy Murad. Despite demands from numerous investigators and the Bankruptcy Court, those records were never provided and have disappeared.

### 2. Woolworth A/R

The Murads also inflated the Woolworth accounts receivable in various financial disclosure statements to BNP and the Bankruptcy Court. They represented the receivables as $749,000 to the Bankruptcy Court. They inflated the receivables by not crediting payments of approximately $348,000 made in February, 1991.

As a consequence of the inflated accounts receivable, Judge Conrad extended to Housecraft the use of cash collateral for a period of three months. The loss caused by that extension was $25,404, together with $39,680 to the Kittel firm for additional fees.

 Abe and Roy Murad are accountable for the additional losses caused by their misrepresentation of the accounts receivables.

Allen Stern assisted the Murads in hiding the true status of the accounts receivable by removing Kmart records from the plant. Review of those records may have resulted in early disclosure of the inflated figures. Stern is equally responsible for these losses.

### H. SHOWBOOTH

 The parties introduced inconsistent evidence concerning ownership of the showbooth. The bankruptcy schedules indicated that Housecraft owned the showbooth. However, the Murads indicated that Robojo owned the showbooth. In light of the confusion over ownership, the Court will not attribute any loss to the Defendants caused by diversion of the showbooth to 142/A & R.

### I. NUTRIBAR CONTAINERS

 Housecraft manufactured polyethylene plastic trays used as containers for a dietary product under the tradename "Nutribar," which was sold by a Sante Naturelle, a Canadian company. Federal Plastics would furnish raw materials used for these products. Housecraft would utilize the Drypol thermoforming machine to manufacture the containers, then ship them to Sante Naturelle for approximately $69 per thousand.

Using business relationships with Federal Plastics, Abe Murad developed a scheme to defraud both the Bankruptcy Court and BNP in a number of ways. First, in early October 1991, Housecraft diverted $24,150 (Canadian) in receipts owed by Sante Naturelle to Federal Plastics. This diversion of assets was not disclosed to the Bankruptcy Court. Abe Murad's testimony that this transaction was merely a "swap" with Federal Plastics for plastic is not credible since Housecraft's shipping records showed no receipt of plastics which were not the subject of a proof of claim filed by Federal Plastics or paid for by Housecraft. In substance, there is no evidence that Federal Plastics gave Housecraft anything in return for diversion of the Sante Naturelle account.

Furthermore, Housecraft shipped Nutribar containers between October 1991 and January 1992 without being paid. In October, Housecraft shipped containers to Feder-

al Plastics for transfer to Sante Naturelle for $26,220 (Canadian). This shipment was not disclosed to the Bankruptcy Court. Once the Murads filed for bankruptcy protection, they did record the shipments made to Federal Plastics, although they listed the price to be received at the below-cost price of $17.71.

■ The post-filing shipments to Federal Plastics constituted bankruptcy fraud for two reasons. First, Abe Murad testified that Housecraft entered into a joint venture with Federal Plastics. That business relationship was never disclosed to the Bankruptcy Court. In fact, Federal Plastics had filed a proof of claim and appeared to be a customer. Failure to disclose that business relationship makes the subsequent business dealings with Federal Plastics a fraud upon the Bankruptcy Court.

Second, there is no proof of receipt of plastic as a part of this joint venture. Review of Housecraft records indicate that Federal Plastics had either been paid for plastic delivered to Housecraft or filed proof of claims.

Approximately $142,000 (Canadian) or $112,000 (U.S.) was received by Federal Plastics from sale of Nutribar containers to Sante Naturelle. The Court will credit the Murad family with the value of plastic allegedly furnished by Federal Plastics at $33 per thousand containers. The total loss assessed is $96,555 (Canadian) or $67,588 (U.S.).

Abe Murad negotiated the arrangements with Federal Plastics and is responsible for the loss. Roy Murad certainly would have been aware of these transactions since he was responsible for the financial well-being of the company. Evidence also exists that the benefits enjoyed by Federal Plastics arising out of these arrangements were to be transferred to 142/A & R, and Roy would have been fully cognizant of such benefits to the new company. Similarly, even if he had no direct knowledge of these transactions, Roy had agreed to the full scope of the conspiracy to divert assets from BNP and the Bankruptcy Court and could have reasonably foreseen these types of fraudulent schemes.

■ There is no direct evidence that Allen Stern was aware of these business transactions. He was neither involved in the financial management of the company nor present when representations were made to the Bankruptcy Court concerning Housecraft's business relationship with Federal Plastics. He acted at the direction of the Murads. As a result, the Court will not attribute this loss figure to him.

## J. VIDA LOAN

■ This fraud stems out of a loan from the Vermont Industrial Development Authority ("VIDA") for the purchase of a thermoforming machine used in making Nutribar containers in 1989. VIDA's policy was to give low-interest loans for up to 30% of the cost of eligible projects. Housecraft "certified" that the total cost of the machinery was $317,750 and supported that assertion with a false invoice from the manufacturer. VIDA then granted Housecraft a loan of $103,000. The actual price of the machinery was $185,500. VIDA's loss attributable to the misrepresentation was $47,350.

Abe Murad testified that the machinery needed additional equipment to be functional and that the cost of that equipment increased the total price to $317,750. However, VIDA required that borrowers certify what they were purchasing and how much it cost. Roy Murad certified that the loan was for purchase of the thermoforming machine, that the price was $317,750 and that Housecraft had already paid $129,750. These figures were inaccurate, and no mention was made of accessories to the machinery. Similarly, the loan was collateralized by the thermoforming machine, not necessarily by additional accessories. The Murads obtained the VIDA loans through false representations and must be held accountable for the resulting loss.

The VIDA loss is attributable to all three Defendants. Roy filed inaccurate loan documents with VIDA. Abe testified to full knowledge of the purchase of the machine. Allen was responsible for production at Housecraft and would have been intimately involved in the purchase. He also corresponded with the manufacturer of the thermoforming machine concerning the price.

## K. CONCLUSIONS: LOSS CALCULATIONS

Based upon the findings above, the following losses are attributed to each Defendant:

### Abe Murad

| | |
|---|---|
| Shipment of Cook Nooks and Flatware | 130,113 |
| State Street Checks to Jemaflex | 142,000 |
| $85,000 in State Street Checks | 85,000 |
| Shipments to 142/A & R | 90,639 |
| F.W. Myers | 38,380 |
| January Shipment to Plattsburgh | 10,000 |
| A/R Fraud | 65,084 |
| Nutribar Containers | 67,588 |
| VIDA Loan | 47,350 |
| Total | 676,154 |

### Roy Murad

| | |
|---|---|
| Shipment of cook nooks and flatware | 130,113 |
| State Street Checks to Jemaflex | 142,000 |
| $85,000 in State Street Checks | 85,000 |
| Shipments to 142/A & R | 90,639 |
| F.W. Myers | 38,380 |
| January Shipment to Plattsburgh | 10,000 |
| A/R Fraud | 65,084 |
| Nutribar Containers | 67,588 |
| VIDA Loan | 47,350 |
| Total | 676,154 |

### Allen Stern

| | |
|---|---|
| Shipment of Cook Nooks and Flatware | 130,113 |
| $85,000 State Street Checks | 85,000 |
| Shipments to 142/A & R | 90,639 |
| F.W. Myers | 38,380 |
| January Shipment to Plattsburgh | 10,000 |
| A/R Fraud | 65,084 |
| VIDA Loan | 47,350 |
| Total | 466,566 |

## II. SPECIFIC OFFENSE CHARACTERISTIC: § 2F1.1(b)(1)(K)

The PSRs assessed each Defendant two additional criminal offense level points for more than minimal planning or a scheme to defraud more than one victim under U.S.S.G. § 2F1.1(b)(1)(K). More than minimal planning is defined as "more planning than is typical for commission of the offense in a simple form," and is generally deemed present "in any case involving repeated acts over a period of time." U.S.S.G. § 1B1.1, Application Note 1(f).

The Defendants' offense involved repeated fraudulent acts over an extended period of time. They have not contested the two level enhancement for more than minimal planning. Each Defendant is assessed that two level enhancement.

## III. ROLE ENHANCEMENT: § 3B1.1

All Defendants have contested the role enhancements attributable to them by the PSRs under U.S.S.G. § 3B1.1. Abe Murad's offense level was increased by four levels for being a leader or organizer of criminal behavior involving five or more participants, while Roy Murad and Allen Stern were each given an increase of three offense levels for being managers or supervisors in such a criminal enterprise.

Section 3B1.1 may be applied if it is proven by the Government by a preponderance of the evidence that a defendant was a "leader or organizer" or a "manager or supervisor" of criminal conduct that involved at least five participants or was "otherwise extensive." The court's inquiry is not limited to a defendant's role in the count of conviction but is to consider all "relevant conduct." *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir.1995); *see* U.S.S.G. § 1B1.3. The Court must address two issues: (1) whether each of these Defendants was a "leader or organizer" or "manager or supervisor," and (2) if so, did the criminal enterprise involve five or more participants or was "otherwise extensive."

## A. LEADERS, ORGANIZERS, MANAGERS, AND SUPERVISORS

Application Note 4 addresses the distinction between "organizers or leaders" and "managers or supervisors:"

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise or decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and

authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy....

U.S.S.G. § 3B1.1, Application Note 4.

The roles of Abe and Roy Murad differed significantly from Stern's. The offense conduct involved, principally, fraudulent financial schemes directed toward the Bankruptcy Court and lending institutions. Elaborate creations of false financial documents and deliberate misrepresentations were devised to implement these schemes. Abe and Roy Murad were the principal originators of these fraudulent schemes. Allen Stern was in charge of production at Housecraft and did not participate fully in the financial decisions of the company. The distinction in these roles is particularly relevant in applying enhancements under § 3B1.1.

 The Court finds that Abe Murad was an "organizer or leader" under § 3B1.1(b). Abe Murad was involved in virtually every aspect of the running of the company. He was the principal architect of the business. He was engaged in negotiations with BNP and other banks over financing. He became involved directly with Housecraft customers and was fully aware of production issues at the company. Housecraft employees clearly identified both Abe and Roy as the "bosses" or "supervisors" of the business. Gadue Grand Jury 8; II Tr. 173 (Langsner): II Tr. 262 (Ludmer). Abe Murad had absolute decision-making authority over the company and its employees. Both Roy Murad and Allen Stern deeply respected his judgment and followed his directions.

 The Court finds that Roy Murad was a "manager or supervisor" under § 3B1.1(b). Roy Murad was primarily involved in the financial operations of the business, and to that extent, was actively involved in the criminal activity. He had extensive discretion over financial decisions, and he was the person principally responsible for fraudulent misrepresentations made to BNP and the Bankruptcy Court. He shared in decisions regarding the diversion of Housecraft assets to 142/A & R. His role easily satisfies the minimum requirement of

being a supervisor. However, Roy worked at the company at the urging of his father. He continued to remain at Housecraft out of respect for his father and to assist Abe in keeping his business afloat. Between the two of them, Abe Murad was ultimately in charge. Because of Roy's deference to the needs and wishes of his father, his role does not satisfy the definition of "leader" under § 3B1.1(a).

 Allen Stern's role is clearly distinguishable from those of both Murads. He had little or no say in financial matters. He was responsible to them out of a sense of respect and family loyalty. It is true that he directed Housecraft employees to divert assets and hide records, albeit at the explicit or implicit direction of the Murads, and he orchestrated the locating of the F.W. Myers warehouse and directed the shipment of assets to that location to defraud the Bankruptcy Court. He also organized the cook nooks and flatware shipments, controlled the movement of Housecraft equipment to Plattsburgh, and directed others to remove the Kmart records. However, the level of independent judgment and discretion which he exercised was minimal. Within the context of the conspiracy, he acted at the direction of other members of the family. Because of his minimal role in the decision-making process within the conspiracy, the Court finds that he was not a "manager or supervisor" under § 3B1.1(b) and is not assessed three additional criminal offense levels.

## B. FIVE OR MORE PARTICIPANTS OR OTHERWISE EXTENSIVE

 The second standard under § 3B1.1 requires the criminal activity to involve five or more participants or be extensive in other ways. The enhancement does not require that each defendant have control over five or more persons, but merely that five or more persons were involved in the criminal activity. United States v. Payne, 63 F.3d 1200, 1212 (2d Cir.1995), cert. denied, — U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

 The criminal activity of the Murad family clearly involved five or more participants. Aside from the three Defendants, Eli Hakey and Don Gadue participated in the

diversion of Housecraft assets and in the hiding of Kmart records. Gadue, who held the position of General Manager at Housecraft, was directed to testify falsely at the Bankruptcy Hearing that all records had been turned over to the bankruptcy monitor when he knew that the Kmart records were being hidden. Stephen Langsner and Kerry Ludmer participated as fronts for the Murads in 142/A & R to enable transfers of Housecraft assets to the new Murad family business. James Brothers managed the Plattsburgh facility and admitted to trying to conceal Housecraft's assets.

 In the alternative, the criminal enterprise engaged in by the Murad family was "extensive." The activity lasted over a period of many months, and in the case regarding the VIDA loan, may have extended back a number of years. Numerous fictitious documents were prepared and presented to the Bankruptcy Court and lending institutions. The Murads testified falsely on many occasions. The Court finds that "extensive" criminal activity under § 3B1.1 is satisfied.

For all of the reasons cited above, the Court finds that Abe Murad was an "organizer or leader" under § 3B1.1(a), that Roy Murad was a "manager or supervisor" under § 3B1.1(b), and that the criminal activity involved five or more participants and was "otherwise extensive." Abe and Roy Murad's criminal offense levels are increased by four and three levels, respectively.

## IV. OBSTRUCTION OF JUSTICE: § 3C1.1

The PSRs recommended that only Roy Murad receive a two-level enhancement for obstruction of justice under § 3C1.1. That recommendation was based upon apparent false financial affidavits filed with the Probation Office, conflicting with other financial disclosures produced by Roy Murad in civil litigation. No such recommendations were made concerning Abe Murad or Allen Stern. The Government, however, now seeks enhancement for obstruction of justice stemming out of each Defendant's false and perjurious testimony at the sentencing hearing. All three Defendants object to the enhancement.

Section 3C1.1 reads:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

Application Note 3 provides a non-exhaustive list of examples of behaviors which result in an obstruction enhancement. Those examples include committing or suborning perjury, producing a false document or record during an official investigation or judicial proceeding, providing materially false information to a judge, or providing false information to a probation officer relating to a presentence report.

 At the outset, the Court concurs with the PSR's finding that Roy Murad falsely represented his income to the probation officer, thereby warranting the enhancement. Roy Murad provided a financial disclosure form listing his net income as $25,915 in 1993 and $20,149.50 in 1994. His gross income for those periods was $102,603 in 1993 and $76,615 in 1994. In Canadian civil litigation involving a former employer, Chad Enterprises, Roy Murad filed a financial report indicating that he received $183,000 from Chad Management in 1994. Chad's affidavits confirm that amount. Chad also swore that Roy Murad received $83,000 in commissions in 1993 and an additional $60,000 from Synstat Management, Inc. Roy Murad refused to provide complete tax records to resolve the issue of his level of income. His representations concerning his income from Chad Enterprises in litigation against Chad are reliable for two reasons. First, Chad could easily disprove false reports of income, so there is little likelihood that Roy Murad would misrepresent his income in that context. Second, Chad corroborates the accuracy of Murad's financial affidavit. The Court finds that Roy Murad's income for those years was falsely reported to the Probation Officer, that such falsity is material in that his income bears relevance to issues of a fine and restitution, and that

Roy Murad should be assessed an obstruction enhancement for this misrepresentation.

The Supreme Court addressed application of § 3C1.1 to perjury in *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). The Court confirmed use of the enhancement against a defendant who testified falsely concerning his participation in the relevant offense. It instructed district courts to "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." *Id.* at 95, 113 S.Ct. at 1117. The perjury definition set out in the *Dunnigan* opinion was as follows: "A witness testifying under oath or affirmation violates this statute [18 U.S.C. § 1621] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* at 94, 113 S.Ct. at 1116.

The Second Circuit has held that under § 3C1.1, district courts must make findings as to each element of perjury, and that those findings may be based upon circumstantial evidence. *United States v. Onumonu*, 999 F.2d 43, 46 (2d Cir.1993). Those elements include that the defendant testified falsely under oath concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. The Guidelines state that "[i]n applying [§ 3C1.1] in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, Application Note 1. The Second Circuit has interpreted this application note as "'instruct[ing] the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction.'" *United States v. Cunavelis*, 969 F.2d 1419, 1423 (2d Cir.1992) (quoting *United States v. Franco–Torres*, 869 F.2d 797, 801 (5th Cir.1989)); *United States v. Matos*, 907 F.2d 274, 276 (2d Cir.1990).

■ Each of the Defendants testified at length at the sentencing hearing. Evaluating each Defendant's testimony in the light most favorable to him, the Court finds by convincing evidence that each Defendant willfully and intentionally gave false and perjurious testimony under oath concerning material facts during the sentencing hearing. The obstruction enhancement is warranted regarding each Defendant.

Abe Murad testified falsely during the sentencing hearing on a number of relevant issues. In each of the following examples, the Court finds that the false testimony was willfully and intentionally given while under oath and related to material facts concerning his sentencing:

(1) He testified falsely concerning the date of origin of 142/A & R, indicating that the idea for the company was initiated after and in response to Howard Hoppenheim's employment by BNP on October 3, 1991. In fact, the meeting at Abe's house occurred in late September 1991, as verified by Stephen Langsner's testimony and the subsequent opening of bank accounts for 142/A & R. This is particularly significant in light of Abe and Roy Murad's claim that their actions resulting in convictions occurred in response to Hoppenheim's behavior.

(2) He clearly misrepresented the Murad family's role in 142/A & R. He testified to a consulting role, while Langsner and Ludmer managed the company. In light of the name of the company, backgrounds of the principals, his involvement in the lease of the business' building and his sharing of the large office, his claim to not running the business is almost comical. That is especially true in light of Roy's acknowledging control of the business.

(3) As noted above, Abe Murad's testimony that the cook nook sets were defective and therefore returned to Jemaflex was blatantly false. Also false was his testimony that the $145,000 payment to Jemaflex was for an outstanding debt, for reasons stated above.

(4) Abe Murad, together with others, created a scheme to falsify financial records to obtain needed cash infusions into his business, and when the business continued to fail, to deflect assets in hopes of starting another company without being saddled

with debt. His testimony consciously and directly denied the existence of that scheme. Such testimony was clearly false and perjurious.

The Court notes that Dr. William Butler testified that Abe Murad is overly concerned with his standing in the community. His singular goal is to maintain his position of status within his family and community. He also provided the psychological profile of a person who would fabricate facts to maintain that status.

■ Similarly, Roy Murad's testimony under oath denying involvement in the scheme to mislead financial institutions and eventually the Bankruptcy Court was intentionally and willfully false.

(1) Roy Murad was intimately involved in the financial affairs of the business and knew of the status of the Kmart and Woolworth accounts receivables. His denial of knowing about the falsity of those receivables in his testimony at the sentencing hearing was clearly false. Similarly, his claimed lack of memory of being confronted by others concerning the status of those receivables was false.

(2) Roy Murad was the principal member of the family charged with the responsibility of obtaining financial assistance from BNP. He exaggerated Housecraft's accounts receivable to BNP and the Bankruptcy Court and manufactured false documentation to support such false assertions. His denial of intentionally misrepresenting BNP and the Bankruptcy Court was perjurious.

(3) Roy Murad's testimony that he played no part in the loss of Kmart records was also false. Evidence elicited at the sentencing hearing proved that Don Gadue turned the records over to him, never to be seen again.

■ Allen Stern was also untruthful in his testimony concerning many material issues at the sentencing hearing. Although he made an effort to be candid concerning some of his culpability, acknowledging, for instance, that he told Hakey to remove Kmart records because he did not want Hoppenheim to gain possession of them, he steadfastly remained loyal to the Murad family and refused to admit their responsibility for this fraudulent activity. He lied about the family's controlling interest in 142/A & R, maintaining that he did not know of the Murads' status within the company. He misrepresented to the Court his involvement in shipments of Housecraft property to 142/A & R. As manager of the Housecraft plant, he was clearly aware of those shipments and lied about his and others' levels of involvement. His denial of knowledge of the illegality of the Plattsburgh shipment was patently false, since he told James Brothers to remove serial numbers on the equipment. His refusal to acknowledge his understanding of the impropriety of the cook nook shipments to Jemaflex was clearly false, since his statements to Eli Hakey regarding the handwritten bills of lading reflect his implicit appreciation of its illegality.

The Court finds that each Defendant knowingly and intentionally provided false testimony under oath on material issues of fact as described above. Such false and perjurious testimony warrants a two-level enhancement for each Defendant for obstruction of justice under § 3C1.1.

V. ACCEPTANCE OF RESPONSIBILITY

■ Section 3E1.1 provides for a two or three level downward adjustment "if the defendant clearly demonstrates acceptance of responsibility." Application Note 4 to § 3E1.1 instructs that "conduct resulting in an enhancement under 3C1.1 ... ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." The Court has found that each Defendant testified falsely before the Court at the sentencing hearing, most often denying responsibility for his criminal conduct. Such testimony is inconsistent with a finding of acceptance of responsibility, given the facts of this case. Each Defendant willfully and intentionally misrepresented his level of involvement in this conspiracy, and in the exercise of the Court's discretion, it finds that no Defendant has clearly demonstrated an acceptance of responsibility for his criminal behavior. As a

result, the Defendants are not entitled to credit for acceptance of responsibility.

## VI. CONCLUSIONS: CRIMINAL OFFENSE LEVELS

Based upon the findings above, the criminal offense levels of each Defendant are as follows:

Abe Murad:

| | |
|---|---|
| Base Offense Level | 16 |
| More Than Minimal Planning | 2 |
| Violation of Judicial or Administrative Order | 2 |
| Obstruction of Justice | 2 |
| Organizer or Leader Enhancement | 4 |
| Total | 26 |

Roy Murad:

| | |
|---|---|
| Base Offense Level | 16 |
| More Than Minimal Planning | 2 |
| Violation of Judicial or Administrative Order | 2 |
| Obstruction of Justice | 2 |
| Manager or Supervisor Enhancement | 3 |
| Total | 25 |

Allen Stern:

| | |
|---|---|
| Base Offense Level | 15 |
| More Than Minimal Planning | 2 |
| Obstruction of Justice | 2 |
| Total | 19 |

## VII. MOTIONS FOR DOWNWARD DEPARTURE

Each Defendant has filed a number of requests for downward departure. The Court will address each ground for downward departure raised by the Defendants in turn.

### A. VICTIM'S IMPROPER CONDUCT

One ground raised by all Defendants seeks a downward departure based upon the improper conduct of one victim in the case, BNP, and its agent, Howard Hoppenheim. The request is based upon U.S.S.G. § 5K2.10, which reads in pertinent part:

There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

The Murads entered into lengthy negotiations with BNP in 1990 concerning the family's decision to purchase Images. They testified they would need three years of significant financial assistance after the purchase of Images before the new company would begin to create a profit. Abe and Roy Murad testified that BNP verbally agreed to their "three year plan," and as a result, they purchased Images. With a change in staff, BNP withdrew from its agreement with the Murads and refused to provide the necessary funding. According to the Murads, BNP actively discouraged other banks from lending them money and prematurely demanded payments on their notes. Finally, the Murads complain of treatment afforded them by Howard Hoppenheim, who, according to the family, deliberately engaged in behavior from the very start to further his own purpose of closing down their business.

The Court is generally wary of engaging in discussion regarding the role of victims in justifying or encouraging criminal behavior. Certainly, the Court has discretion to downward depart from pertinent guideline ranges based upon improper behavior engaged in by victims or others. Unfortunately, all too often persons convicted of criminal acts attempt to shift responsibility for their behavior from themselves to others, and most often, to their victims.

In this case, the Court finds that BNP acted reasonably. There is a factual dispute as to whether BNP made verbal assurances to financially support the Murads' three year plan. Since the negotiations involved experienced businessmen and millions of dollars, it is inconceivable that such promises, if made, were not reduced to writing. The Murads made the ultimate decision to purchase Images, and if the success of that investment was dependent upon assurances of adequate funding, they should have sought those guarantees in a legally enforceable agreement.

During the early part of 1991, BNP extended the Murads' line of credit to $8,500,000 despite many difficulties with the loan. Housecraft/Robojo's borrowing exceeded the agreed loan amounts, and serious concerns were raised as to whether the loans were

sufficiently collateralized. BNP became wary and demanded repayment of the loan by October 5, 1991. Certainly BNP's concerns were justified, since, unbeknownst to the Bank, the Murads had already engaged in fraudulent behavior by falsely representing the company's financial picture.

■ The Murads also complain that Howard Hoppenheim's behavior contributed to their criminal conduct and that this warrants a downward departure. BNP appointed Hoppenheim as a consultant to Housecraft/Robojo on October 3, 1991. His relationship with the Murads was confrontational and hostile. While it may be true that Hoppenheim's decisions to change locks, frisk the Defendants and demand records contributed to a siege mentality, the fraudulent behavior had begun long before Hoppenheim's involvement. The Defendants had already met in Montreal in late September to create 142/A & R, with the intention of diverting Housecraft assets. They had inflated accounts receivable on their financial disclosures to BNP for months before Hoppenheim's appointment. Housecraft's decision to file for Chapter 11 bankruptcy protection followed closely Hoppenheim's demands for Kmart records which would have revealed the company's fraudulent behavior. The Court cannot find that the Murads' criminal behavior was caused by their reaction to Hoppenheim because much of their criminal conduct had already occurred prior to his appointment. Furthermore, whatever criminal behavior the Murads engaged in after Hoppenheim's involvement is due to choices they made and is no way attributable to BNP. Hoppenheim's conduct did not justify or excuse acts of perjury and fraud before the Bankruptcy Court.

Based upon all of the above, the Court denies each of the Defendants' motions to depart from the guideline sentencing range due to improper victim behavior.

### B. ABERRANT BEHAVIOR

■ Each Defendant seeks a downward departure based upon the fact that his criminal conduct constituted aberrant behavior. The Second Circuit has recognized that

district courts may exercise their discretion to depart from offense levels if a defendant's conduct constituted a "single act of aberrant behavior." *United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir.1991). The aberrant behavior ground for downward departure has been extended to situations in which defendants engaged in a series of acts over a one month period. *United States v. Takai*, 941 F.2d 738, 743–44 (9th Cir.1991). Although the Second Circuit declined to address the issue of whether a pattern of acts can constitute a "single act of aberrant behavior" in *United States v. Altman*, 48 F.3d 96, 105 (2d Cir.1995), the Court finds that it does have discretion to consider such a pattern of conduct in ruling upon a downward departure motion.

In this case, each Defendant has led an exemplary life prior to engaging in the criminal behavior which forms the basis of conviction. All had been successful and respected businessmen. Abe and Roy Murad in particular have been actively involved in their religious communities. All three Defendants have been active and supportive fathers. There is nothing in their previous lives from which one could predict their involvement in this fraudulent behavior.

However, each Defendant engaged in a comprehensive and lengthy scheme to defraud BNP and, ultimately, the Bankruptcy Court. Although it may be true that the Murads acted under a siege mentality and with an intention of saving their business for at least some time during the conspiracy, their fraudulent activity extended over many months, required extensive planning, involved the creation of numerous false documents, and occasioned the giving of false testimony under oath on a number of occasions. They developed and implemented an elaborate fraudulent scheme. The Court does not find that this behavior constituted a "single act of aberrant behavior," and denies each downward departure request.

### C. LOSS OVERSTATES SERIOUSNESS OF CRIMINAL CONDUCT

■ Abe and Roy Murad assert that the loss figure attributed to them overstates the

seriousness of their criminal behavior, inviting the Court to depart downward to a more appropriate criminal offense level. The Second Circuit has recognized such a ground for departure in *United States v. Brach*, 942 F.2d 141, 145 (2d Cir.1991); U.S.S.G. § 2F1.1, Application Note 10.

U.S.S.G. § 2F1.1 defines the manner in which criminal offense levels are to be calculated for crimes involving fraud. Courts are to add point levels based upon the loss amount to a base level of 6. Implicit within that calculation is the Sentencing Commission's determination that the relative seriousness of the criminal conduct corresponds to the criminal offense level arrived at by means of this procedure.

The Court declines to downward depart based solely upon an overstating of the seriousness of the Defendants' conduct. Substantial losses were suffered by BNP. The criminal behavior was deliberate and extended over a lengthy period of time. The Court finds such conduct to be extremely serious, and finds the applicable criminal offense levels attributed to each Defendant to be appropriate.

■ The Defendants also seek a downward departure because their intent was not to steal money or personally profit by their activities. *United States v. Monaco*, 23 F.3d 793, 799 (3d Cir.1994); *United States v. Takai*, 941 F.2d at 743. Again, the Court has discretion to depart from the guidelines pursuant to this theory. However, the Defendants shared in the ownership of Housecraft, and their financial health was tied to the business. Although they did not intend to pocket the moneys defrauded from BNP directly, they hoped that those moneys would save the business to their personal benefit. As such, this fact pattern is clearly distinguishable from fraud schemes in which the purpose is to benefit others. A departure from the applicable offense level is not justified under this theory.

## D. UNIQUE FAMILY CIRCUMSTANCES

■ Courts have consistently held that ordinary family circumstances do not justify departures, despite the fact that the resulting prison terms may disrupt parental relationships. *United States v. Johnson*, 964 F.2d 124, 128–30 (2d Cir.1992). A district court's authority to depart for "extraordinary family circumstances" is also well recognized. *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991). Each Defendant seeks a downward departure based upon his unique and extraordinary family relationship.

Each Defendant is a member of a viable and healthy family unit. Both Roy Murad and Allen Stern are financially responsible for their families. Each defendant is actively involved in the lives of his children. The sentencing hearing addressed mostly guideline application issues. The Court reserves judgment on each of the Defendant's motions for departures based upon extraordinary family circumstances for additional argument of counsel.

Allen Stern has raised a corollary argument regarding extraordinary family circumstances. He claims that much of his behavior should be judged in light of his relationship to Abe Murad, and that his loyalty to Abe provides a unique explanation or justification for his behavior. The Court will also reserve judgment on this request for further argument of counsel.

## E. OTHER GROUNDS

Abe Murad has raised a number of additional grounds which, he argues, taken either singly or in combination, justify a departure. He asserts that he has been severely punished and that the sentencing goals of specific and general deterrence have been achieved. He also cites his age and fragile emotional condition. All three Defendants point to their extraordinary employment record as justification for a departure.

■ Generally, a district court has authority to depart under 18 U.S.C. § 3553(b) where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." In *United States v. Gaind*, 829 F.Supp. 669, 671

(S.D.N.Y.1993), *aff'd,* 31 F.3d 73 (2d Cir. 1994), the Court found that "[t]he Sentencing Guidelines do not consider the situation presented by complete presentence destruction of a major business previously owned and operated by the defendant as a result of discovery of the crime, where this destruction achieves in part the purposes of the sentence itself." In essence, the Court in *Gaind* found that key purposes in sentencing under 18 U.S.C. § 3553(a)(2)(C) and § 3553(a)(2)(B), to protect the public from further crimes and to provide specific and general deterrence, were satisfied by the destruction of the defendant's business. Similarly, district courts may depart in cases in which the defendants present extraordinary health risks or in which they have suffered extreme mental anguish. See *United States v. Monaco,* 23 F.3d at 801. Courts may also consider these conditions cumulatively, even if such factors do not justify a departure when taken individually. U.S.S.G. § 5K2.0, Commentary.

Again, the Court reserves judgment on these grounds for downward departure for further argument of counsel.